RUTH PACE, Appellant, v. APPANOOSE COUNTY, Appellee.

MASTER AND SERVANT: Findings by Industrial Commissioner.
1   A finding by the Industrial Commissioner that an employee was
or was not "in the course of his employment," or that the in-
jury did or did not arise "out of" the employment, is *conclusive*
in those cases where the testimony is (a) conflicting, or (b) not
conflicting, but subject to different inferences.

MASTER AND SERVANT: Injuries Which Arise "Out Of" Em-
2   ployment. An injury arises "*out of*" an employment when it is
in some sense due to the employment—when it results from a
risk reasonably incident to the employment.

   PRINCIPLE APPLIED: See No. 4.

MASTER AND SERVANT: "In the Course of Employment." An
3   employee is "*in the course of his employment*" when he is at a
place called for by his contract of service, is there for the pur-
pose of performing such service, and is doing something which
is necessarily connected with and is a part of said service, in
the sense that both the master and the employee knows it must
be done before the employee can enter upon the actual per-
formance of said service.

   PRINCIPLE APPLIED: See No. 4.

MASTER AND SERVANT: When One is "Contractor" and Not
4   "Employee." A contract for services creates the relation of
*contractor* and employer, and not the relation of *employee* and
employer, when, in its *essential* features, the employer retains no

control over the *details* of the work, but only over the *results*. It follows that the retention by the employer of *some* control over the one doing the work does not necessarily render the latter an "employee."

PRINCIPLE APPLIED:     Deceased agreed to furnish to a county, for use in road work and during the working season, an engine and himself or another in his stead to operate it, and also agreed to furnish a team and wagon and a man to do necessary hauling in connection with the engine.     The essential work to be done by deceased was *to haul the grader*, and to give full satisfaction in so doing.     The county furnished its own grader and its own employee to operate it.     The only control which the county retained over deceased or over those employed by deceased was that the man operating the grader told deceased or his employee *where* to run the engine while it was actually hauling the grader.     Deceased was to receive the lump sum of $14 per day.     Deceased sometimes operated the engine, and sometimes his employee operated it.     Deceased had two engines.     On one occasion, deceased's employees were hauling the grader with the small engine, while deceased was making necessary repairs on the larger engine.     After the repairs were finished, deceased took the engine from his home (which was some miles from the place where the road work was being done) to the east end of a bridge, to which the road work had been finished.     The grader had been left at a point over a mile west of said bridge.     After the repaired engine had arrived at the bridge, the deceased took it, and started across the bridge, intending to go to the grader, a mile west, and attach the engine thereto, and continue the grading at that point.     The bridge gave way under the weight of the engine, and deceased was killed.     *Held*:

1. Deceased was, at the time, "in the course of his employment," and his death arose "out of" his employment.

2. But deceased was an independent contractor, and not within the benefits of the Workmen's Compensation Act.

*Appeal from Appanoose District Court.*—F. M. HUNTER, Judge.

SEPTEMBER 30, 1918.

AN appeal was taken to the district court by the claimant, as widow of decedent, from the dismissal of her claim by the Iowa Industrial Commissioner, reversing the award

of the committee of arbitration. On hearing, the decision of the commissioner was affirmed, without prejudice to an action by the administrator of decedent's estate against the county. The claimant appeals.—*Affirmed.*

*Wilson & Smith,* for appellant.

*G. A. Hodgman, M. H. Cohen,* and *H. S. Greenleaf,* for appellee.

LADD, J.—I. A bridge in Appanoose County collapsed, and John F. Pace, who was driving an engine over it, was killed. This occurred on July 9, 1914. He had entered into an agreement with that county, April 15th preceding:

"That, for the consideration of $14 per day for each and every day's work on the public highway of Appanoose County, Iowa, the party of the first part employs the said second

1. MASTER AND SERVANT: findings by Industrial Commissioner.

party with his team and engine and use one county grader on the county highway for the working season; and the said second party agrees to do said work and also to furnish his team and engine for the above amount stated, and further agrees to give entire satisfaction to said first party, said first party agreeing to furnish gasoline for the engine. Second party is to furnish one man with team, ten hours be considered a day's work."

Fairly construed, this was a written employment of Pace, with engine, man, and team, by the county, for the lump sum of $14 per day of 10 hours. The terms, condi-

2. MASTER AND SERVANT: injuries which arise "out of" employment.

tions, and provisions of the Employers' Liability and Workmen's Compensation Act are obligatory upon the county, as well as upon those employed by it (Par. c of Section 2477-m of the Code Supplement, 1913); and one of the issues in this case is whether the injury arose out of and in the course of the employment by the county. If so, this must be conclusive from the evidence; for, when the evi-

dence bearing thereon is in conflict, the conclusion of the
Industrial Commissioner is final. In other words, the
courts may not interfere with the findings of fact made by
the Industrial Commissioner, when these are supported by
evidence, even though it may be thought there be error. The
evidence on which the Commissioner concluded that Pace's
injury did not arise out of and in course of his employment,
if such there were, is not conflicting, nor, as we think, is it
open to different inferences to be drawn therefrom. Buck-
alew was employed by him, and either drove the team haul-
ing oil, which the county furnished, or operated the engine
in pulling the grader. Later, Strauser also was employed
by Pace in these capacities. For some days prior to Pace's
death, they had attended to the engine and the oil wagon,
while Pace was engaged in repairing another engine. It
appears that he had two engines, one about double the
weight of the other; and, after using the larger engine be-
tween two and three weeks, on what is known as the State
Road, extending west out of Centerville, the engine needed
repairing; and thereupon it was set aside, and the smaller
engine used by the employees in grading, while Pace repaired
the larger engine. In the meantime, the grading was done
to the bridge,—which was some 85 feet long,—save a little
work required on the east approach. The smaller engine
had been driven over the bridge in the morning of July 9th,
and the grader had been left about $1\frac{1}{4}$ miles west of it. The
grading to be done was about a mile farther on. The large
engine had been brought to the east end of the bridge in
the morning; and, as the smaller engine was thought not
to be heavy enough, upon his arrival, somewhat after 7
o'clock A. M., Pace started the larger one over the bridge,
with the design of going to and attaching it to the grader
and proceeding with the work of grading, in pursuance of
the contract; but whether he intended to continue in charge
of the engine or to have one of the employees do so, does not

appear. The point, however, is quite immaterial; for if taking the engine from its position àt the east end of the bridge to the grader arose "out of and in the course of" the employment under the contract, the circumstance that an employee of his might operate the engine, later on, did not change the character of what he had done. If what he did was of the character stated, the fact that he did not expect to operate the engine indefinitely, or beyond a definite point, would not change it; and what may have been intended with respect to who should operate the engine after reaching the grader, is without bearing on the issues presented. Pace gave about one third of his time to the work, and kept in close touch with what was being done. One Meirs was employed by the county to handle the grader. It was his business to "shape up" the road, and see that it was properly graded. He would attract the attention of the engine operator by ringing a bell, and by motion indicate any change desired in the direction of the grader.

This evidence shows without conflict that the place of doing the work was certain highways, which were to be improved. The engine was an instrumentality made use of in accomplishing the work to be done. Its removal from one portion of the highway to another, as this was required in the process of grading, was merely incidental to that work. It had been stopped, not by way of abandonment for another, but for the purpose of being repaired, and with the design of attaching it to the grader as soon as this should be accomplished. When repaired, it was being moved from the place in the highway where it ceased hauling the grader on its way, to where the grader then was, with the intention of continuing the work in pursuance of the requirements of the contract. The movement of the engine from one portion of the highway to another was merely incidental to the performance of the work in grading the road, and apparently an essential part of it. Hauling the grader was the work

contemplated by the contract, but to do this, some move-
ments of the engine unattached were reasonably necessary,
and, as said, incidental to performing the work contem-
plated. While being repaired, the small engine had been
used, and the grading done up to the bridge approach, but
this was not completed; so that, when Pace started, the en-
gine was on a portion of the highway not finished, and he
was attempting to drive it to the grader, about a mile and
a quarter farther on, in order to proceed with the grading.
Even if it were to be said that only the portion of the
highway uncompleted might be regarded as the place of
his employment, Pace was at such place, and was doing
that which was incidental to the very work he was engaged
to do.

The cases quite generally recognize a distinction be-
tween "arising out of" and "in the course of his employ-
ment," though, in several jurisdictions, the phrase "arising
out of" has been omitted from the enact-
3. MASTER AND
SERVANT: "in
the course of
employment."
ment. In *Bayer v. Bayer*, 191 Mich. 423
(158 N. W. 109), the phrase "in the course
of employment" was construed as though in-
cluding "arising out of," found in the acts of other states.
The distinction, however, is noted in *State v. District Court
of St. Louis County*, 129 Minn. 423 (151 N. W. 912), and has
been recognized in England. *Fitzgerald v. Clarke & Son*
(1908) 2 K. B. 796; *Moore v. Manchester Liners*, 3 B. W. C.
C. 527. In *McNicol v. Patterson Wild & Co.*, 215 Mass.
497 (102 N. E. 697), the court clearly draws the distinc-
tion:

"It is not easy nor necessary to the determination of
the case at bar to give a comprehensive definition of these
words which shall accurately include all cases embraced
within the act, and with precision exclude those outside
its terms. It is sufficient to say that an injury is received
'in the course of' the employment when it comes while the

workman is doing the duty which he is employed to perform. It 'arises out of' the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation, as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workman would have been equally exposed apart from the employment. The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It needs not to have been foreseen or expected, but after the event, it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

The same question was under consideration in *Bryant v. Fissell,* 84 N. J. L. 72 (86 Atl. 458), where the court said:

"It remains to be considered whether the accident arose both 'out of and in the course of his employment.' For an accident to arise out of and in the course of the employment, it must result from a risk reasonably incidental to the employment. As was said by Mr. Lord Justice Buckley, in *Fitzgerald v. Clarke & Son* (1908) 2 K. B. 796: 'The words "out of" point, I think, to the origin and cause of the accident; the words "in the course of," to the time, place, and circumstances under which the accident takes place. The former words are descriptive of the character or quality of the accident. The latter words relate to the circum-

stances under which an accident of that character or quality takes place. The character or quality of the accident, as conveyed by the words "out of," involves, I think, the idea that the accident is, in some sense, due to the employment. It must be an accident resulting from a risk reasonably incident to the employment.' We conclude, therefore, that an accident arises 'in the course of the employment' if it occurs while the employe is doing what a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time."

See *Griffith v. Cole Bros.*, 183 Iowa 415. The test in determining whether the injury has arisen in the course of employment is there said to be "whether deceased, 'though actually through with the work, was still within the sphere of the work,' * * * was doing what 'a man so employed may reasonably do within a time during which he is employed, and at a place where he may reasonably be during that time.'" The decisions of the court and commissions are uniform in holding that, if an employe has reached his employer's premises on his way to work, or is still on the premises on his way home, and meets with an accident, usually it will be adjudged to have arisen out of the employment. See *Stacy's* case, 225 Mass. 174 (114 N. E. 206); *De Mann v. Hydraulic Engineering Co.*, 192 Mich. 594 (159 N. W. 380).

In Bradbury on Workmen's Compensation (3d Ed.) 471, the reports of commissioners so holding are collected:

"An employe of the government was employed to proceed to a certain point on a succeeding day, and carry with him for a distance of eight miles certain tools and equipment of the government which were necessary for the work in hand. Before reaching the destination, he was injured by one of the tools he was carrying. It was held that the injury arose in the course of the employment, which be-

gan when he started on the journey with the tools.    *Re S. J. Connor,* Op. Sol. Dep. L., (1915) p. 330. A man was employed as a well-borer. While riding to work on his bicycle, he collided with an automobile, and sustained a fracture of the leg. By the contract of employment, the employe was allowed to ride to and from work on the time of his employer. It was held that the accident arose out of the employment. *Hiserman v. Garside,* 1 Cal. Ind. Acc. Com. (Part 11), 516; 12 N. C. C. A. 383. * * * A superintendent of an irrigating company was injured while returning to his home on his early morning rounds, incidentally for his breakfast, but partly to receive telephone orders, complaints, and the like. It was held that the accident arose out of the employment. *Matney v. Azusa Irrigating Co.,* 2 Cal. Ind. Acc. Com. 893; 12 N. C. C. A. 394. A school teacher, who was required by her superior officer to attend certain teachers' meetings, was struck by an automobile and killed, while she was on her way from the schoolhouse to the place where the meeting was held, and it was held that the accident arose out of the employment. *McCord v. Oakland School Dist. of Alameda County* (1916) 3 Cal. Ind. Acc. Com. 307."

These quotations illustrate the general tendency in construing such statutes. Other illustrations are found in *Griffith v. Cole Bros.,* supra.

As pointed out, Pace was engaged in the act of moving his engine from one point where he was engaged to do the work to another; and, therefore, what he was doing was in the course of performing his work, under these decisions; and the moving of the engine, as he was undertaking to do, was incidental to the work of hauling the grader. Although not hauling the grader, Pace was proceeding so to do with the engine, on the ground where the work was to be done. What the law intends is to protect the employe against the risk or hazard taken in order to perform the

master's task. Had the injury occurred while bringing the machine from Pace's home, some miles distant from the place of employment, a different question would have been presented. As it was, the machine was on the ground, and it was being taken from one place thereon to another, in the performance of work he had been employed to do; and we reach the conclusion that, under the record, there is no controversy but that the injury arose "out of and in the course of the employment," if such there were.

II. A more difficult question is presented by the county's contention that Pace was an independent contractor, and not a mere employe of the county. The contract, though

4. MASTER AND SERVANT: when one is "contractor" and not "employee."

in writing, is not entirely definite, nor as specific as it might have been; but its meaning is not uncertain, when viewed in the light of the evidence, and as construed by the parties thereto. Pace furnished the engine, with himself or another in his stead, to operate it; and also a team and another man to haul the gasoline, water, and anything else required by the engine. The period of the employment was during the season, and Pace was to receive the lump sum of $14 per day. The work to be done was hauling the grader along the highway, where directed by Meirs, an employe of the county. The only control exercised by the county was through Meirs, in directing Pace where the engine should haul the grader. The Employers' Liability and Workmen's Compensation Act provides indemnity "for any and all personal injuries sustained by an employe" only. Section 2477-m, Code Supplement, 1913. An employe is defined, in Paragraph (b), Section 2477-m16 of the Code Supplement, 1913, as "any person who has entered into the employment of, or works under contract of service, expressed or implied, or apprenticeship for an employer, except a person whose employment is purely casual and not for the purpose of the employer's trade or business or those engaged

in clerical work only, but clerical work shall not include one who may be subjected to the hazards of the business or one holding an official position or standing in a representative capacity of the employer, or an official elected or appointed by the state, county, school district, municipal corporation, cities under special charter and commission form of government; provided that one who sustains the relation of contractor with any person, firm, association, corporation or the state, county, school district, municipal corporation, cities under special charter or commission form of government, shall not be considered an employe thereof."

It will be observed that the employment or work must be "under contract of service, expressed or implied," and when so, this brings the employe within the purview of the remedy provided; and that the relation of contract *for* service is excluded from the terms of the act.

An employe has been defined to be a person bound, in some degree at least, to the duty of service, and not a mere contractor, bound only to produce or cause to be produced a certain result. See, also, Wood on Master & Servant, Section 317. It was said, in *Simmons v. Heath Laundry Co.,* 3 B. W. C. C. 200, that, generally speaking, a servant is a person who is subject to the command of his master, as to the manner in which he shall do his work.

"The greater the amount of direct control exercised over the person rendering the services, by the person contracting for them, the stronger the grounds for holding it to be a contract of service; and, similarly, the greater the degree of independence of such control, the greater the probability that the services rendered are of the nature of professional services, and that the contract is not one of service."

See Harper on Workmen's Compensation, 114. In Vol. 1, Labatt's Master & Servant (2d. Ed.), Section 64, the author says that:

"The accepted doctrine is that, in cases where the es-

sential object of an agreement is the performance of work, the relation of master and servant will not be predicated, as between the party for whose benefit the work is to be done, and the party who is to do the work, unless the former has retained the right to exercise control over the latter, in respect to the manner in which the work is to be executed. This attribute of the relation supplies the single and universally applicable test by which the servants are distinguished from independent contractors."

The test oftenest resorted to, in determining whether one is an employe or an independent contractor, is to ascertain whether the employe represents the master as to the result of the work, or only as to the means. If only as to the result, and he himself selects the means, he must be regarded as an independent contractor. *Overhouser v. American Cereal Co.*, 118 Iowa 417; *Francis v. Johnson*, 127 Iowa 391. The mere fact that the owner may have an overseer or architect to see that the work complies with the contract, or that the work is to be to the owner's satisfaction, does not change the character of the contract, if it meets the test stated. *Humpton v. Unterkircher*, 97 Iowa 509.

The manner of payment, though often significant, is not necessarily controlling. Thompson on Negligence (2d Ed.), Section 629. That author says:

"The test lies in the question whether the contract reserves to the proprietor the power of control over the employee."

In Shearman & Redfield on Negligence (6th Ed.), Section 166, it is said that even reservation of the right of inspection at all times, and the requirement that the work must be done subject to the approval of the employer, does not make a servant of the one who is doing the work, *where there is no reserved right to dictate the details of the method being used, or any right to interfere with the servants of the party doing the work.*

Whatever the other conditions of the contract may be, if, in its essential features, it provides that the employer retain no control over the details of the work, but leaves to the other party the determination of the manner of doing it, without subjecting him to the control of the employer, the party undertaking to do the work is a contractor, and not a mere employe. Reverting to the facts of the case at bar, it will be observed that the work to be done was hauling the road scraper. This was to be done with an engine, to operate which two men and a team were required. What Pace contracted to do was to furnish these men, team, and engine, by which the work was to be done. How the engine was to be operated, or the manner of doing the work, was not specified, and the county reserved no control thereof, nor as to the days during which it should proceed. Moreover, no control whatever was exercised by the county, other than through Meirs, in handling the scraper, and then only in signalling where on the road it should be drawn, and in saying when the grade was completed. Pace, in fact, determined the days on which the hauling should be done, and what portion of each day it should proceed. Practically, he was merely to furnish and apply the power by which the scraper was hauled, and all this in the manner to be determined by himself.

Under the contract, the county had no control over the men employed or the manner of performing the work, nor had it any authority to discharge an employe of Pace's nor to direct him in what he was to do. Had one of these employes of Pace's been injured, no one would pretend to say that he was an employe of the county's rather than of Pace's. The latter stood in no different relation; for he might elect whether he would operate the engine or drive the team, or have somebody else do so. Under these circumstances, the authorities are all but conclusive that he should be deemed an independent contractor, rather than an employe. Some

light is thrown on the subject by decisions in relation to teamsters, though these seem in hopeless conflict as to whether, where the owner of a team hires it out at a stipulated sum, for the services of himself and team, he is an employe or a contractor; and the same conflict appears in cases where the owners of teams hire them out with drivers employed by them, concerning which is the employer of the driver, the owner of the team or the party for whom the work is to be done. See Bradbury on Workmen's Compensation (3d Ed.) 163.

The case of *Western Indemnity Co. v. Pillsbury*, 172 Cal. 807 (159 Pac. 721), is instructive. One Tittle was engaged in performing work for the city and county of San Francisco, in connection with a municipal railway line. Stevens offered to furnish teams and drivers for the work at $6.00 per day, for team, wagon, and driver; and later was notified that Tittle required a team, which Stevens furnished, driving it himself. Later, he furnished another team and wagon, with a driver. Stevens was injured, and demanded compensation, which was allowed him by the commission, on the ground that he had "agreed to provide a team and wagon, and drive it himself." It appeared from the evidence that Tittle's foreman directed Stevens and his driver concerning materials to be hauled.

"There was no agreement regarding the bulk of matter or the number of loads per day, but each wagon was to be used for the period of eight hours a day, both in removing the rubbish and surplus sand that accumulated from Tittle's work as general contractor constructing the railway tracks, and also in hauling lumber and rock for the use of Tittle. But there is no word of evidence that Stevens was employed personally to drive either of his teams. He was to furnish the means of accomplishing certain results—namely, drivers, teams, and wagons; and there was no element of personal service in the contract. It is true that he did drive

one of his own wagons; but, if he had desired to devote a day to other occupations, his contract with Tittle would have been fully performed if he had put any competent man in charge of the horses he had been driving, because he had been required to furnish 'teams' (which included wagons and drivers). * * * At the end of each week, an envelope was given to Stevens, containing pay at the rate of $6.00 per day for each team, neither he nor his driver receiving any segregated sum from Tittle as wages. It is clear that the contract was not one between employer and employe, in the sense of Section 14 of the Compensation Act, but one by which Mr. Stevens agreed to furnish facilities for doing a certain sort of work."

After referring to the California statute, which is substantially like that of this state, and defining employe, and reaching the conclusion that Stevens was not the employe of the contractor, Tittle, the court proceeded:

"It is urged with much force that, since the foreman for the Tittle Company directed Stevens in the matters of the materials to be hauled, the latter was not an independent contractor—that the test of what constitutes independent service lies in the control exercised, and that the driver, being under the supervision of the foreman, was, therefore, an employée of Tittle. It is true that many authorities specify 'control' of the person performing work as the means of differentiating service from independent employment. The test of 'control,' however, means 'complete control.' For example, the citizen who hires a taxicab to take him to a certain place exercises that amount of control over the driver, but he does not thereby become the man's employer. Labatt, in his work on Master and Servant, (2d Ed.) Section 25, says: 'It is well settled that, where one person is performing work in which another is beneficially interested, the latter may exercise over the former a certain measure of control for a definite and restricted purpose, without in-

curring the responsibilities, or acquiring the immunities, of a master, with respect to the person controlled.' "

The court then refers to authorities sustaining this view, and reaches the conclusion that:

"In the case at bar, confusion arose out of the fact that Stevens drove his own team, but we see nothing in that fact which made him a servant and not a contractor. The commission found that Tittle had the right and power of discharging the applicant (Stevens) *and* ruling his team off the work' if the services rendered were unsatisfactory, but the conjunctive is very significant. Tittle could not, under the contract, discharge Stevens *or* dispense with the services of the team. The agreement was not thus divisible, and clearly Stevens was not the employee of Tittle. The same distinction between a servant and an independent contractor is observed in *Bennett v. Truebody*, 66 Cal. 510 (6 Pac. 329, 56 Am. Rep. 117). If Mr. Stevens' driver who had charge of the other wagon had met with an accident, his employer would have been liable, and the assumption by Stevens of a dual role of contractor and driver did not shift the liability. It has been said that the true test of a contractor is that he renders service in the course of an independent occupation, following his employer's desires in the results but not in the means used (1 Shearman & Redfield on Negligence [6th Ed.] 396), but in weighing the control exercised we must carefully distinguish between authoritative control and mere suggestion as to detail or the necessary co-operation where the work furnished is part of a larger undertaking. *Standard Oil Co. v. Anderson*, 212 U. S. 221, 222 (29 Sup. Ct. Rep. 252, 53 L. Ed. 480). The same principles are announced in *Fink v. Missouri Furnace Co.*, 82 Mo. 276 (52 Am. Rep. 376). In *Chisholm v. Walker & Co.*, 2 B. W. C. C. 261, a case very much like the one at bar, arising under a workmen's compensation statute, it was held that the man who received a certain sum per day for

the work of himself and his horse was not engaged in a 'contract of service.' "

The court reached the conclusion that Stevens was not an employe of Tittle's, but an independent contractor, and thereby reversed the holding of the commission.

In *See v. Leidecker*, 152 Ky. 724 (154 S. W. 10), See was a farmer, and owned an ox team, with which he did heavy hauling. Leidecker employed See to haul a heavy boiler from the railroad station to a point several miles distant, where Leidecker was preparing to bore a well for oil. See, with his team and hands, loaded the boiler onto a wagon, and hauled it to the place of delivery, and left the wagon standing with the boiler on it until the following morning. See and his men went to the place, for the purpose of unloading. As Leidecker wished the boiler unloaded at a particular place, and set in a particular way, he gave directions to See accordingly. For the purpose of holding the boiler, or as a means of pulling it off the wagon, Leidecker directed See to put a chain around the boiler, and for the purpose of connecting it, told See to pass the chain under the boiler and hand it up on the other side. In doing this, See went under the boiler, and put his head between it and the coupling hole, whereupon the boiler toppled over toward the opposite side, struck him upon the head, and badly mashed it. The court, in holding that the relation of master and servant did not exist, declared that the rule is that:

"One who contracts to do a specific piece of work, furnishing his own assistants, and executing the work either entirely in accordance with his own ideas, or in accordance with a plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter in respect to the details of the work, is an independent contractor, and not a servant. 26 Cyc. 970. The petition stated that See had hired his team and wagon to

Leidecker, who was in full charge of them, and that See was in Leidecker's service, thus making the averments of the petition strong enough to bring the case within the principles governing a case of master and servant. The proof, however, does not sustain the petition in this respect, since it clearly shows that See was an independent contractor, using his own teams and men, in a single employment, and for a single compensation. His contract bound him to haul the boiler from the railroad station, the exact spot of delivery to be designated by Leidecker. It was proper for Leidecker to give directions for the location of a heavy piece of machinery, and his acts in that connection were no more than would be expected of any owner, in directing the delivery of goods of that character."

See, also, *Cheever's* case, 219 Mass. 244 (106 N. E. 861) ; *Thompson v. Twiss,* 90 Conn. 444 (97 Atl. 328) ; *Chisholm v. Walker,* 2 B. W. C. C. 261; *Matter of Powley v. Vivian & Co.,* 169 App. Div. 170 (154 N. Y. Supp. 426) ; *Matter of Rheinwald v. Builders Brick & Supply Co.,* 168 App. Div. 425 (153 N. Y. Supp. 598). In *Ryan v. County Council of Tipperary,* 49 Ir. L. T. 1, the deceased owned a horse and cart, and did a carting business. For several years, he had hauled stones for the county council, though he did not work continuously but for a day, or a part of a day, as he wished, being under no obligation to do the work at any particular time, or in any particular amount of one day. He was not controlled in the work by the county council, except that their surveyor told him whether he desired the stones to be hauled. He was paid five shillings per day for the work he did, or, if he worked only a part of a day, a corresponding amount. He was kicked by his horse, when harnessing it preparatory to going to his work of hauling the stones. He was adjudged by the court to be an independent contractor, relying largely upon *Chisholm v. Walker,* supra, a case arising under a workmen's compensa-

tion statute, in which it was held that a man who received a certain sum per day for the work of himself and his horse was not engaged in a "contract of service." In that case, Lord Justice Clerk, in distinguishing it from a case of earning wages, said that:

"In many trades, a workman is expected to bring his own tools, and these tools are to be used by his own personal power. He does the work; they only are his means for doing the work by his own hands and strength. In that case, the work is done by the workman, himself, using the tools. In the present case, the horse is the means by exercise of the power by which the work is done."

See also *Day v. Town of Ellington,* Third Annual Report (1914) Wis. Ind. Com. 74. In *Busse v. Brugger,* Third Annual Report (1914) Wis. Ind. Com. 78, the applicant and Martens were the owners of an ensilage cutter, engine, and silo-filling outfit, and engaged in cutting ensilage and filling silos for farmers, giving their personal services, in so far as necessary for the operation of the machinery, and feeding the cutter at a charge of $2.00 per hour for the time actually consumed in filling the silo. Gasoline was furnished by the farmer; everything else by them. They had filled the silo for respondent in 1912, and were engaged by him to do so in 1913,—nothing further being said about the price, though the charge had become established in the neighborhood. While doing the work, in the afternoon of September 29th, the blower device became clogged, and the applicant removed a plate or cap which covered a hole in the drum through which entrance could be had to the fan. This plate or cap was not replaced, and the suction drew the applicant's hand into the machine, resulting in the loss of all the fingers and a portion of the palm of his right hand. The commission held the applicant not an employe, but said that the applicant and Martens were independent contractors, emphasizing the fact that they had the right to com-

plete the job, that respondent had reserved no control over them, and could discharge neither one, and that their only duty was to see that the machinery ran properly, and to feed the corn to it, and that the respondent could require nothing else. The decisions by the several commissioners are not controlling, but indicate the tendency in construing the Workmen's Compensation Acts in the several states. There seems no escape from the conclusion that Pace sustained the relation of contractor with the county, and not that of employe, under the terms of Section 2477-m16 of the Code Supplement, 1913. The agreement involved no element of personal service. All there was to be done was to operate the engine so as to haul the grader along such portions of the highway and as long as directed by the agent of the county. Those so operating the engine were the employes of Pace, and not of the county. Neither could have been discharged by the county; its only election was to permit the work of hauling the grader to go on as Pace chose, or terminate the contract. His only duty was to furnish the engine, team, and men, and to see that the engine was properly operated, and the team handled with ordinary care. This was done on such days or parts of days as he might choose, and according to his notion or that of his employes of the manner of operating the engine and handling the team. The result to be accomplished was the hauling of the scraper on such portion of the highway as the county's agent might direct, but without authority on his part to direct the manner or time of so doing. In other words, Pace was to accomplish a particular purpose: that is, to haul the scraper in such manner and at such time as he might elect, and with facilities furnished by him, and to receive a lump sum of $14 per day therefor. Therein, he was not the employe of the county but a contractor for service, and his widow was not entitled to the benefits of the Employers' Liability and Workmen's Compensation Act. This, how-

ever, does not interfere with her right to prosecute any claim she may have for damages in an ordinary action.— *Affirmed.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.