NELL KANIPE, Administratrix, Appellee, v. GRUNDY COUNTY RURAL ELECTRIC CO-OPERATIVE, Appellant.

No. 45734.

NOVEMBER 18, 1941.

O. H. Allbee, Bordewick & Powell, and J. W. Tobin, for appellee.

Hallagan, Fountain, Steward & Cless and Willoughby, Strack & Sieverding, for appellant.

STIGER, J.—About two o'clock on the afternoon of April 7, 1939, plaintiff's husband, Chester A. Kanipe, an employee of the Cento Construction Company, was killed by contact with a live wire on an electric highline of defendant.

The Cento Construction Company, as an independent contractor, had constructed several miles of defendant's electric system. It appears defendant had accepted the project built by Cento Construction Company and was furnishing electricity to its customers several days prior to the death of Mr. Kanipe.

There were sags in the electric wires at several places on the line and it was the duty of the construction company to tighten loose wires to the proper tension under its contract to

complete the work in a workmanlike manner, otherwise, so far as shown by the record, the project had been completed.

Otto Tennant was the general maintenance man for defendant. His duties were to keep its lines in operation and repair.

One of the important issues in the case is whether Tennant, at the time of the death of Kanipe, was an employee of defendant or a loaned or special employee of the construction company.

Plaintiff charged in her petition that Tennant, an employee of defendant, was negligent: First, in turning on the electricity on the wires upon which Chester A. Kanipe was working, when Tennant knew or by the exercise of proper care, should have known, that the deceased was working on the said wires. Second, in failing to warn the deceased of the fact that Tennant was re-energizing the line with a powerful current of electricity.

Defendant has presented three propositions on which it relies for reversal, all of which are based on the alleged error of the court in overruling its motion for a directed verdict. Defendant's assignments of error are: 1. Otto Tennant was a loaned or special employee of the Cento Construction Company on April 7, 1939, and was not an employee of defendant at the time Mr. Kanipe received his injuries. 2. There is no evidence from which the jury could find the defendant or its employees were negligent. 3. Plaintiff's decedent was guilty of contributory negligence.

The following evidence is material to the questions presented for decision on this appeal. In the evening of April 6, 1939, Mr. Cento went to the office of defendant and told Tennant that the wires had to be resagged at three places on the line, two of which were northeast of Gladbrook and one west of Gladbrook, and asked him whether he would be available the next day to cut off the current at the three places so his crew could tighten the wires. Tennant replied that he would be available and was told where he should meet Cento's workmen the next morning. Before leaving the next morning, R. F. Cramer, superintendent of defendant co-operative, gave Tennant authority to de-energize the line as requested by Cento. Mr. Cramer testified:

"Mr. Tennant stated that Mr. C. R. Cento who is the contractor for building of the line under his contract had asked him to go out and de-energize the line for the crew that he was sending out to resag this wire. I asked Mr. Tennant how many places that they had to resag and he said that there would be three on lines that had been energized. I gave Mr. Tennant permission to do that."

Tennant met the construction crew the next morning at the appointed place. The crew consisted of Martin Conley, Patrick O'Malley and Chester Kanipe.

There were two wires on the new construction. The top wire was the live or hot wire and the bottom wire was the neutral or cold wire. On this first job northeast of Gladbrook, Tennant de-energized the line by removing the jumper from the top wire and connecting it with the neutral wire. This was done about a quarter of a mile north of where the men were to work. Tennant returned and told the crew the wire was dead, remained until the work was completed, and then replaced the jumper which re-energized the line.

At the second place at which the wires were to be resagged, Tennant cut off the current about five miles away in the same manner as at the first place. He drove back to the crew and told them he had cut off the current. Tennant then gave foreman Conley a pair of rubber gloves and a short piece of copper wire and directed him to test the wires so that he—Tennant—would be sure that he had de-energized the right line. Conley, at the direction of Tennant, made the test and found the current was off.

Tennant then left this place and when he returned the crew had gone. Tennant then patrolled this line to assure himself that the men had completed their work on this line and were not working on the wires. He then re-energized this line.

Tennant then proceeded to the third place where the wires were to be tightened to the proper tension and found the crew waiting for him. It was at the east end of this third line that Mr. Kanipe received the injuries that resulted in his death. This line, called a stub line, was about a mile and a quarter long, running east and west. Tennant met the crew about

two thirds of a mile west from the east dead end of the line. He then drove about two and a quarter miles and pulled a switch that cut off the current on this line. When he returned he told the crew the line was dead and they could go to work. He then asked Conley how long it would take to resag this line. Conley stated: "After Mr. Tennant's arrival, Mr. Tennant asked me if we were ready to go to work, and I told him we were, as soon as the line had been disconnected. Mr. Tennant said, 'I will go up and disconnect the line for you'. He left and went west and north. We waited for him to return to tell me whether he had disconnected the line or not for us. He came from the west and told me that the line was dead, that we could go ahead and work. That was about two o'clock or possibly a few minutes after. Then Mr. Tennant asked me how long I thought that it would take. I told him I didn't know. He asked me if it would be an hour or an hour and a half and I told him I didn't know, I didn't know exactly what I had to do yet. I didn't know how long it would take me. He said, 'Well I will be back' and he left." Tennant then went to Conrad for lunch. From this place where the conversation occurred, which was two thirds of a mile west from the east dead end, the crew worked west resagging the wires to the west dead end. They then went to the east one half of the line to repair an improper sag near the east dead end of the line.

Kanipe worked on the second pole from the end and Conley on the third pole. At that time the top wire was dead. Kanipe finished his work on the second pole and climbed up and started to work on the corner pole. His head came in contact with the top wire and he was electrocuted by receiving the full charge of electricity of 7,000 volts. Mr. Tennant had returned to the place where he first met the crew and not seeing the men there or west of said place he assumed they had completed the job and he turned on the current.

When Tennant returned to the point two thirds of a mile east of the east dead end he could not see the men working at the east end because a hill obscured his vision. The reason Tennant gives for not driving down the east end of the line to find out whether the men were working on that part of the line

is that he claims Conley told him at the place two thirds of a mile west of the east dead end that he was going to resag from that point west to the dead end, and said nothing about re-sagging east of that point or at the east dead end. That Conley's version of the conversation as above set out is quite different than Tennant's version and that Conley immediately went to the east end of the line after resagging the west part of the line will be referred to later in the opinion. When Tennant closed the switch he did not know where the men were. All he knew was that they were not working on the west part of the line.

■ I. We will consider defendant's first proposition and the question is whether Tennant on April 7, 1939, and at the time of the accident was an employee of the construction company or of the defendant. We are of the opinion this question was properly submitted to the jury.

The test of relationship of master and servant is not only the actual exercise of power of control by the master over the details and methods to be followed by the servant in the performance of the work, but also the right to exercise such control. Pace v. Appanoose County, 184 Iowa 498, 168 N. W. 916; Estate of Amond, 203 Iowa 306, 210 N. W. 923; Lempke v. Fritz, 223 Iowa 261, 272 N. W. 300.

■ A general employee of one employer who has been temporarily loaned to another for a special service does not become the employee of the borrower unless the original employer surrenders full control over the servant so that the servant is under the control and direction of the borrower in the performance of the particular act. That is, the original relation of master and servant must be temporarily suspended and a new relation between the borrower and servant must be created. 35 Am. Jur. 970, section 541; Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480; Hooper v. Brawner, 148 Md. 417, 129 A. 672, 42 A. L. R. 1437; 39 C. J. 1274, section 1462; Swartzwelter v. Iowa Southern Utilities Corp., 216 Iowa 1060, 250 N. W. 121. We conclude from this record that Mr. Tennant, in de-energizing the wires and then re-energizing the wires on April 7, thus restoring the service of his company to its patrons, was acting under his employment by defendant and performing his duties as general maintenance man.

The construction of the project had been substantially completed, defendant had taken possession of the lines and was operating them as owner on the day of the accident. It was producing and distributing its electricity over these new lines to its customers. So far as shown by the record all that remained to be done by the contractor was to tighten these wires. The employees of the contractor were trained linemen and capable of doing the work performed by Tennant, but Cento did not undertake to cut off the current being supplied to its customers by defendant. He requested defendant to de-energize its lines so he could complete his contract. Conley exercised no control over Tennant. Tennant used his own judgment, chose his own methods in shutting off the current. Conley, the employee of the construction company, did not have the right to exercise or purport to exercise the slightest control over Tennant as to the details and methods to be followed by him in de-energizing and re-energizing the lines. The crew did not start work at any of the three places until Tennant advised the men the wires were dead and they could proceed with the work.

Tennant did nothing that was a part of the construction contract in suspending service and restoring defendant's service to its customers. He was performing his duty as maintenance man to keep the line in operation, a duty performed at the direction of his superintendent. Defendant, through Tennant, was co-operating with the construction company, doing that which was necessary in order that it could complete the project. It was as advantageous to the defendant as to the construction company to have this work done and the project completed. As suggested, heretofore, the question whether there was a change of masters, whether Tennant was acting as the employee of defendant on April 7 was properly submitted to the jury. Defendant cites Miller v. Minnesota & N. W. Ry. Co., 76 Iowa 655, 39 N. W. 188, 14 Am. St. Rep. 258; Traynor v. Keefe Construction Co., 199 Iowa 575, 202 N. W. 218; Swartzwelter v. Iowa Southern Utilities Corp., 216 Iowa 1060, 250 N. W. 121. The cited cases are not inconsistent with the conclusion we have reached in this division of the opinion.

II. Defendant's next proposition is that there is no evidence of negligence on the part of defendant or its employees.

Defendant claims that Tennant was not negligent in turning on the current without driving down to the east end of the line to see if the crew were working on that part of the project for the reason Conley told him at the point two thirds of a mile west of the east dead end and prior to the time he went to Conrad for lunch that:

"He was going to resag the job there, from the point west to the dead end. He did not then, or at any other time, say anything to me about any resagging on east of that point or around at the east dead end."

Defendant claims that Tennant, after returning to said point and finding the men gone and then driving to the west end of the line to see if they had completed this job, was justified in assuming they had finished their work and had left for home and that in turning on the current without driving down to the east end of the line where he would have seen the men, Tennant was not negligent as a matter of law.

We cannot agree with this contention. Tennant and defendant knew there were three places to be resagged. It should be observed that under Tennant's version of the conversation Conley did not tell him that he did not intend to resag the east end after completing the work on the west part of the line.

But Conley differs with Tennant as to this conversation. Conley testified for the plaintiff as heretofore shown that Tennant asked him how long he thought it would take on this line and he replied that he did not know, "that he did not know exactly what he had to do yet." According to this testimony nothing was said about sagging only the west part of the stub and Tennant had no reason to believe the crew intended only to resag the west one half of the line. Conley obviously did not believe the understanding with Tennant was that only the west one half of the line would be resagged, because as soon as that work was completed he immediately took his men to the east end and started resagging the loose wires. It is significant that Conley was working on the wire that Tennant prematurely re-energized with Kanipe and he must have assumed, with Kanipe, the current would not be turned on by Tennant until the work at this end was finished.

Conley's testimony is more favorable to plaintiff than Tennant's testimony and in considering the motion for a directed verdict we must take the view of the testimony most favorable to plaintiff. The jury could readily find from this record that Tennant, who could not see to the east end from the place where the conversation took place, was negligent in not traversing the line to the east end for the purpose of determining whether the men were still at work or had completed this job as he had done at the first two places.

Tennant had control of this dangerous current and it was his duty to exercise care commensurate with the danger in determining whether the crew had finished their work and were in a position of safety when he turned on the current.

We hold the question of defendant's negligence was for the jury.

III. The next assignment of error for consideration is that plaintiff's decedent was guilty of contributory negligence as a matter of law. We are of the opinion this issue was properly submitted to the jury.

Defendant states Kanipe was an experienced lineman and was negligent in working on the wires without having a ground wire between him and the source of the current as an added precautionary measure. No ground wires were used as an added precaution during the resagging on April 7. At the second job Tennant gave Conley a copper wire for the sole purpose of determining whether he had de-energized the right wire. Neither Tennant nor Conley deemed the added precaution necessary. Conley, an experienced lineman, testified when a witness for defendant, that he had not used ground chains on R. E. A. projects that were energized. There is no question but that the several methods used by Tennant to de-energize the wires were adequate and successful without the use of ground wires, which fact, of course, was known to Kanipe. The wire at which Kanipe met his death was dead until Tennant turned on the current just before Kanipe completed his work on the last pole.

There was testimony by Mr. Cramer, superintendent for defendant, that after the current is turned off by removing the

fuses from a switch there are several possible ways by which the current could pass through the switch; such as cobwebs getting in an insulator, or by a defective insulator, by current "jumping across" under wet conditions. The witness further testified:

"On the neutral wire there is a possible chance of, well, it would, might make, you can get static electricity. On the neutral wire, on this particular type of the system, you could have a storm in one area, and receive lightning shock from the neutral wire, on fifty or sixty miles away, and still receive an electric shock of a lightning nature. A ground chain or ground cable, which I have described placed on the wire near where the man was working, would protect him from those dangers."

So far as shown by the record, the witness testified only to possibilities and none of the possible conditions testified to by the witness were present on the day of the accident. The dead wire became a live wire solely through the act of Tennant. Defendant also claims Kanipe was present at the conversation between Conley and Tennant and should have known that Tennant would have no reason to believe he was working on the east end of the line when he turned on the current. Our prior comment on this conversation disposes of this claim.

Tennant told the crew before leaving for Conrad that he would come back, that is, come back and re-energize the line. At each prior job Tennant did not re-energize the lines until he made a thorough investigation and found the men had completed the work and had left the danger zone at the wires.

We cannot hold on this record that Kanipe should have anticipated Tennant would turn on the current while he was working at the wires or that he was negligent in not using ground wires.

We have carefully considered defendant's fourth assignment of error and conclude it does not have sufficient merit to warrant its consideration. This is especially true in view of the conclusions heretofore reached.—Affirmed.

MILLER, C. J., and GARFIELD, OLIVER, BLISS, WENNERSTRUM, SAGER, and HALE, JJ., concur.