NETTIE R. REID et al., Appellants, v. AUTOMATIC ELECTRIC
WASHER COMPANY et al., Appellees.

**MASTER AND SERVANT:** Workmen's Compensation Act—Hear-
1  say Evidence. Relevant hearsay evidence, received without ob-
jection, must be given due consideration, on hearings under the
Workmen's Compensation Act.

**MASTER AND SERVANT:** Workmen's Compensation Act—Review
2  on Appeal. The refusal of the arbitration committee and of the
industrial commissioner, on review, to consider hearsay evi-
dence (introduced without objection) and an ex-parte affidavit,
under the mistake of law that the same were wholly incom-
petent, is reviewable on appeal. (Sec. 2477-m33, Code Supp.,
1913.)

**MASTER AND SERVANT:** Workmen's Compensation Act—Ex-
3  Parte Affidavits. Ex-parte affidavits material to the issues *may*
be received and given consideration in hearings under the
Workmen's Compensation Act: exceptional circumstances may
imperatively *require* the reception of such evidence. So held
where affiant was in the army. (Sec. 2477-m24, Code Supp.,
1913, as amended by Ch. 270, Sec. 15, 37 G. A.)

**MASTER AND SERVANT:** Workmen's Compensation Act. An
4  injury to an employee "*arises out of*" an employment:
    1. When the injury results from a risk reasonably incident
to the employment and to the duties of the employee thereun-
der; or (as it is sometimes phrased)
    2. When it is apparent to the rational mind, in view of all
attending circumstances, that a causal connection exists between
the conditions under which the employee is required to perform
his work, and the resulting injury.
    These principles are none the less applicable because of the
intervention of an act of God which the acts or omissions of
man have humanized.
    *Held*, the death of an employee "arose out of" his employment,
when the employee, being warned by the master to cease work
and leave the building, on account of an on-coming storm, re-
mained to close the windows, *which was part of his duties*, and
was killed while so doing, by the blowing down of the building
by the storm.

*Appeal from Jasper District Court.*—CHAS. A. DEWEY, Judge.

OCTOBER 4, 1920.

THIS is a proceeding under the Iowa Workmen's Compensation Statute, by dependents, to recover for the death of a workman from an injury alleged to have arisen out of and in the course of his employment by defendants. The claim was disallowed by the arbitration committee before which the evidence was taken. The evidence was all certified, and was properly before the commissioner and before the district court, and is before us. On review before the industrial commissioner, the conclusion of the arbitration committee was sustained. From this ruling, on appeal to the district court, there was a finding for defendants, confirming the decision of the commissioner, and the claimants' appeal was dismissed on the merits, and judgment rendered against them for costs. The claimants, plaintiffs, appeal.—*Reversed.*

*O. P. Meyers,* for appellants.

*Stipp, Perry, Bannister & Starzinger,* for appellees.

PRESTON, J.—No question is made but that claimants were dependents, and the committee found that deceased, George M. Reid, was contributing $20 per month to their support. Deceased, an unmarried man, and claimants, constituted one family. Two of the claimants are his parents. Deceased was in the employ of defendant washer company, and was one of its foremen. The factory was a block long, east and west, with various partitions, and had an exit at the west and another to the east, through the office. The west part of it was two stories high, and the east part, four stories. Deceased worked in the southwest corner of the second floor of the four-story part, with windows near him. He was injured on May 21, 1918, and died a few hours after-

wards. He was injured by debris from the higher part of
the building, which crashed through to where deceased was,
the crash being caused by a windstorm, about 5 o'clock
in the afternoon of that date. The factory was partly de-
stroyed. The regular quitting hour was 6 P. M. There
are stairs from one floor to another. The president of de-
fendant factory testifies:

"Foremen were all instructed, especially when weather
was threatening, to see that all windows within their jur-
isdiction were closed when they quit work. At the time of
his death, Reid was foreman in his department. His duties
as foreman, as regards closing windows when the gong
rang, were the same as foremen in all departments: that,
upon leaving work for the day, all windows of that par-
ticular department must be closed. We sound a gong at
regular hours for commencing and closing work. Electric
factory horns and signals, operated automatically, by a
master clock; and, for an emergency, and dismissing men
at odd hours, we have an extension of this system into the
office, in the nature of a push button. Pressure on this
push button blows the horns. On this particular day, after
watching the storm approach, some five minutes,—it was
probably going to be severe,—I concluded that the men
should be dismissed from the building, which was done by
pushing this button, and sounding the alarm all over the
building. I operated the horn, when the accident occurred,
in a series of short, quick blasts, intended as a danger
signal that something was wrong. I wished the men to
leave their places of work and hunt places of safety. It was
not like the sound at regular quitting hour, when there
was no unusual occurrence. He [deceased] also did some
work in the northwest corner of the same room and floor,
and he would naturally be obliged to close, or see that all
windows in his jurisdiction were closed, which would in-
clude both southwest and northwest corners. The instruc-
tions were to close the windows, because we didn't know
how serious a storm was coming up. I tried to arouse the
men and women, and get them out quick. They had not

been instructed as to any particular whistle that indicated to them that they must leave the building. The crushing in of south wall caused his death. It was all over in a short time after the gong sounded."

Some of the witnesses refer to the sounding of the gong or horn as a whistle, indicating that it takes the place of a whistle. This sounding of the gong can mean only one of two things: either the commencing or stopping of work. The foremen in every other department did close their windows at this time, as testified by the president. The president testified further:

"In watching the storm, it was five minutes before I thought there was any danger, or was much scared."

A witness testified:

"He censured himself because he had not blowed it sooner."

It is shown that the usual way for the men to leave the factory, when quitting, was in the west part of the factory, through a stairway in the west room of the entire factory, a room beginning some 50 feet west of the four-story part; that the men went west to that room and stairway to get out, when the gong was sounded; that all went west. The four-story part of the building was swept off and went over and fell and crashed on second-story part, and down through. A witness testifies that, as he went west to get out, he met some man going east, near west room of factory. Would not swear it was deceased; were all in a hurry. The father of deceased, who had worked in the factory a few days before the date in question, testifies:

"I was working on the third floor of the defendant's factory. A workman said to me, 'There is an awful looking cloud out there.' I opened a window and looked out, and thought the cloud was high, and would go over us; closed the window, and started back to work, when the gong sounded a warning of closing. The rest started to leave the room, and passed me. I looked out the south window, and began to see boards and other debris flying in the air. I landed on the second floor, and had to go past

the bench where George worked, but he wasn't there.
* * * Just as I approached the stairs leading to the
first floor, I met him coming back on the run. Where I
met him was west of the part that was crushed in. I
passed him, I would say, 30 feet—I had got beyond where
the crash came. When it came, I stopped, knowing it use-
less to go farther. The instant I stopped, I commenced
calling, and started back, realizing he might be caught in
that crash. I saw the limbs of a man, projecting from under
the debris; the rest of the body was covered. I commenced
uncovering, and saw it was my son. * * * I was work-
ing in east part, on third floor. When I heard the gong, I
went to stair leading from the third to second floor, and then
went west, on the second floor, right past the bench where
my son, George, worked, and kept on going west; and met
him right near and little this side of the stairs leading
from the second floor to the first, in west part of factory.
This was approximately about 60 feet west of bench where
he worked. He was then going east, and I was going west
to get out. * * * I was on the run—was walking fast.
I met nobody else. Several others were just ahead of me,
but all going west, toward the exit. * * * The gong is
used the same as a whistle in a factory. It was a violent
storm. Would have been extremely bad, if it had been
closer to the ground. Several factories and residences were
damaged. My son was the only one killed, and Mr. New-
quist was the only one severely injured, as I recollect. De-
fendant's factory was damaged the greatest."

This witness testified further, on cross-examination by
defendants, and without objection, as follows:

"Mr. Newquist was injured the same time as my son.
His position in factory was timekeeper. Q. Do you know
what he [Newquist] was doing at the time of the accident?
A. Yes. Q. State what he was doing. A. He was going
over from his office to the factory, and he started to leave
[help] my son to close some of the windows, and the crash
came and caught both of them."

On redirect examination of witness by claimants, this appears:

"Q. You were asked in regard to where Mr. Newquist was at the time of this storm, and what he was doing, and so on. Can you state more in detail about Newquist, as to what he had done, or said to your son, and what your son was doing? A. This I can state from the statement I have from him. Q. I would not refer to that. State a little more in detail. You spoke of him a while ago. A. Newquist told me he was in the act of——

"Mr. Parmenter (for defendants). We object to the statement of what he was told, as hearsay evidence as to what Newquist said. He, perhaps, will be available as a witness.

"Mr. Meyers (for claimants). You went into it.

"Court. Objection overruled.

"Mr. Parmenter. Ruling of court objected to.

"A. (continued). Mr. Newquist said that George was in the act of closing the windows, and he started to help him, when the crash came, and that was the last that he knew. He was unconscious."

On examination by the chairman of the committee, witness testified further, without objection:

"Mr. Newquist was employed in defendant's factory as timekeeper. He was going back through the factory, and saw George in the act of closing the windows. He was injured pretty badly. Think his nose was broken; did not think he would recover, for some hours.

"REDIRECT EXAMINATION (BY CLAIMANTS).

"Mr. Newquist is now at Camp Pike; he was drafted in the military service. I wrote him in regard to this matter, and he sent me this affidavit. [Affidavit is marked "Exhibit B."] This is statement I referred to before. My son belonged to Sunday School."

Exhibit B, the affidavit just referred to, was offered in evidence, and the following objection and record appear:

"Mr. Parmenter: Defendants object thereto because it is not the best testimony; that it purports to be an affidavit of a witness for whom the law has provided a way that he can be reached. It would be decidedly unfair to this defense not to give them an opportunity to cross-examine.

"Chairman: Why could not the deposition be had?

"Mr. Meyers: Well, he didn't know, hardly, where he would be. We knew he was at Camp Pike, just a few days ago. It has practically all been given through his own questions.

"Chairman: Exhibit B, offered by claimants, may go in. It is understood that a voucher of that kind cannot be taken with as much value as a deposition, and can only be taken for what it is worth.

"Mr. Parmenter: Ruling of the court excepted by defense."

Exhibit B is as follows:

"State of Arkansas, County of Pulaski.

"I, Edward J. Newquist, having been duly sworn, in the case wherein L. D. Reid is plaintiff, and .............. is defendant, testify the following state of facts:

"On the 21st day of May, 1918, I was in the employ of the Automatic Electric Washer Company, of Newton, Iowa, in the capacity of timekeeper and had been in their employ for several months. About 5 o'clock of the above date I was in the office of said company when the storm approached, and I started to walk back through the factory. I met George Reid, who went to close a window, and I started to help him, but before I reached him the crash came, catching both of us. I was unconscious for some time. I remember that George had passed beyond the part that was afterwards wrecked by the storm; but came back to close the windows; a duty which his position required him to perform, and so doing, lost his life. Signed and sworn to, October 26th, 1918," etc.

Some of the witnesses refer to the storm as a wind storm; others, as a violent storm; and others, as a tornado.

Such is the substance of the testimony, so far as it re-

lates to the matters presented, which are: Whether it was shown that deceased was, at the time he was injured, engaged in the act of putting down the windows, which was a part of his duty, under his employment; and whether his injury arose out of his employment; and whether his injury was brought about by an act of God, rather than by the employment. The arbitration committee, in finding for the defendant, held that the injury suffered by deceased did not arise out of his employment, and was not a personal injury, within the meaning of the Iowa compensation laws, for the reason that it was brought about by an act of God, rather than by the employment. This position was sustained by the decision of the commissioner. The order and finding of the commissioner states, in part:

"Review is instituted by dependent parents, upon the ground that the facts in evidence do not support the finding of the arbitration committee. George Reid was at work on second floor of his employer's plant, when the alarm was sounded, calling workmen to seek safety from the approaching storm. His father testifies that, as he was approaching the stairs leading to first floor, he met his son coming back on the run,—that is to say, running away from the stairway through which workmen were seeking to escape. Claimant's contend that he was returning for the purpose of closing windows in south side of building. Defendant suggests the theory that, finding the stairway, commonly used, in a congested condition from a rush of workmen, he turned back to seek exit at another stairway to first floor. There is no tangible support for the contention of claimant, apart from the affidavit of Edward J. Newquist. * * * Affidavits are admitted in evidence in compensation hearings for the purpose of corroboration, but, standing alone, are not assumed to be available for the establishment of vital issues. The record does not justify the assumption that the purpose of closing windows was in the mind of George Reid, when he was caught in the collapsing building. It is incumbent upon the claimant in all compensation cases to establish by preponderance of evidence vital issues involved.

However plausible conjecture may be, it is not sufficient basis for an award. The question uppermost in this consideration is: Did the death of George Reid arise out of and in course of his employment? The record does not establish this essential basis of compensation, either in fact or in law. If it were assumed that this workman was, at the time of his fatal injury, bent upon the purpose of closing the windows, as claimed, this fact is not established; and, if it were established, there would yet be wanting elements of compensable relationship deemed essential in compensation jurisdiction generally."

The commissioner, in his finding, then proceeds to refer to the case of *Griffith v. Cole Bros.*, 183 Iowa 415, which he considered, to a considerable extent, as analogous to the case at bar, and held that the arbitration

1. MASTER AND SERVANT: Workmen's Compensation Act: hearsay evidence.

committee did not err in finding that dependents of deceased were not entitled to compensation, for the reason that his accidental death was brought about by an act of God, rather than by the employment. It may be remarked, in passing, that this case is referred to in note to *Wiggins v. Industrial Acc. Board*, 54 Mont. 335 (L. R. A. 1918 F, 932), where, at page 937, it is thought that the decision is placed upon the wrong ground. On appeal to the district court, a hearing was had upon the transcript, certified by the commissioner, and exhibits; and only matters so transcripted were considered. The district court dismissed the appeal, as before stated.

The first question is whether it was shown, either by hearsay evidence, not objected to, or by the affidavit of Newquist, or both, that deceased was, at the time of his injury, engaged in the act of putting down the windows, which was a part of his employment, or a part of his duties under his employment. It seems to be conceded, inferentially at least, by counsel for appellees and by the commissioner, that, if it had been proven that deceased was putting down the windows, compensation would be due, unless, as counsel for appellees contend, and the commissioner held, the

injury was caused by the act of God. It is contended by appellees that the affidavit was inadmissible to prove that deceased was putting down the windows at the time he was injured. They argue that the rule ought not to be established, in the hearing of compensation cases, that affidavits are admissible, and that it would be a farce to try such cases in that manner; and they urge that the bars should not be thrown down, and frauds encouraged, by decision that these cases may be so tried. Doubtless the same argument was made before the committee and the commissioner, who seem to have taken that view. The hearsay evidence on that point went in without objection, and the affidavit was admitted over objection. But it is plain that both the committee and the commissioner considered and held, as a matter of law, that the affidavit could not be considered; and it is equally apparent that no consideration was given by either to the hearsay evidence or to the affidavit. If they were laboring under a misapprehension as to the law, and for that reason did not consider the evidence, and if either or both may be considered, and establish the fact, then it becomes a question of law for us.

The record as to both matters is before us; and if they may, under the circumstances, be considered, then there is no dispute in the evidence on the point as to what deceased was doing, and it becomes our duty to enter such decree as will enforce the legal rights of the parties, as disclosed by the facts appearing in the record. Legal conclusions of commissioner may be reviewed. *Griffith v. Cole Bros.*, 183 Iowa 415, 422; *McNicol's Case*, 215 Mass. 497 (L. R. A. 1916 A 306); *Dietzen Co. v. Industrial Board*, 279 Ill. 11 (116 N. E. 684).; *Bradley Mfg. Wks. v. Industrial Board*, 283 Ill. 468 (119 N. E. 615); *Holbrook v. Olympia Hotel Co.,* 200 Mich. 597 (166 N. W. 876). If this evidence, undisputed as it is, may be considered, and it was disallowed and not considered by the commissioner, under a mistake of law, then there was no sufficient competent evidence in the record to warrant the

2. MASTER AND SERVANT: Workmen's Compensation Act: review on appeal.

commissioner in finding that deceased was not engaged in putting down the factory windows, and in such a case his finding would not be conclusive, under Section 17, Chapter 270, Acts of the Thirty-seventh General Assembly.

1. Appellees suggest the theory that deceased turned back to seek exit at the east, or at another stairway to the first floor, and that his going east is compatible with that theory. Some of the cases hold that there may be a recovery when a party is going to or from his work, or the place of the performance of his duty. Appellee contends that there is no evidence that he was closing windows at the time of his injury, and the commissioner seems to have so held, when he said that there is no tangible support, apart from the affidavit of Newquist, that deceased was returning for the purpose of closing windows in the south side of the building. But we think there is more to the evidence than this, even outside the hearsay statements and the affidavit. It seems to us that, considering all the circumstances and the proper inferences to be drawn therefrom, the other proof comes very near establishing, if, indeed, it does not establish, the fact that deceased was in that act, and in the performance of his duty. It appears without dispute that the purpose in sounding the alarm was that the employees might escape to a place of safety; that all others but deceased and Newquist got out of the factory safely, and were uninjured; that deceased was near the west entrance, and doubtless could have escaped as well as the others, but he turned back; that he was found buried under the debris, near the place where he would naturally be in closing the windows; that it was his duty to close them, and the presumption is, not that he was not in the performance of his duty, but rather that he was. *Holland-St. Louis Sugar Co. v. Shraluka*, 64 Ind. App. 545 (116 N. E. 330, 332.) But conceding, for the purpose of the argument, that all these circumstances do not quite establish the fact, slight evidence would be sufficient, if undisputed, to connect up the other circumstances. We think the statements of the father, though hearsay, admitted as they were, and

the affidavit, clearly make the connection, and establish the fact. Taking up now, and considering first, the question as to the hearsay evidence, which, as said, went in without objection, and, further, was brought out by the defendants themselves, on cross-examination. We are considering now the verbal statements of the father of deceased, which, the evidence shows, were based upon the sworn statement of Newquist, in the affidavit. The statute bearing upon the questions, both as to whether hearsay evidence and the affidavit may be considered as proof, provides:

"While sitting as an arbitration committee, or when conducting a hearing upon review, or in the making of any investigation or inquiry, neither the commissioner nor the arbitration committee shall be bound by common law or statutory rules of evidence, or by technical or formal rules of procedure, but may hold such arbitrations or conduct such hearings and make such investigations and inquiries in the manner best suited to ascertain the substantial rights of the parties." Chapter 270, Acts of the Thirty-seventh General Assembly.

In referring to another provision of the Compensation Act, we said, in *Rish v. Iowa Portland Cement Co.*, 186 Iowa 443, that the provisions of the act are highly remedial, and should be liberally construed, without regard to technical rules, so as to carry out the purpose and object of the act. See, also, *Holland-St. Louis Sugar Co. v. Shraluka*, supra. The same rule applies to the words "arising out of and in the course of the employment." *United Paperboard Co. v. Lewis*, 65 Ind. App. 356 (117 N. E. 276).

In *Mitchell v. Phillips Mining Co.*, 181 Iowa 600, at 607, we said, in speaking of some of the provisions of the act, that a radical change was made, with reference to the matter of evidence, and that the purpose of the act was to provide a system whereby employers and employed might escape the evils of personal injury litigation, etc. We think it was the purpose of the legislature to relax somewhat the rules of evidence, and that the proceedings should be more informal than an ordinary proceeding at law. We have so

held as to pleadings in probate. *Chariton Nat. Bank v. Whicher,* 163 Iowa 571.

We have a statute (Section 4944-h4, Supplemental Supplement, 1915,) that trial may be had upon affidavits in a contempt proceeding, where a party may be sent to jail. That statute also provides that it may be tried upon affidavits, or that either party may demand production and oral examination of the witnesses. It is the general rule that a material fact at issue may be established by hearsay evidence, where the same is admitted without objection. *Hege v. Tompkins,* (Ind. App.) 121 N. E. 677, 679. Same principle as to secondary evidence. *Kenosha Stove Co. v. Shedd,* 82 Iowa 540, 544. In the *Hege* case, supra, the court said:

"The reasons for adopting the above rule in ordinary civil actions apply with even greater force in hearings before the industrial board. It is evidently the intent of the Workmen's Compensation Act that, by concise and plain summary proceedings, controversies arising under the same should be promptly adjusted by a simplified procedure, unhampered by the more technical forms and intervening steps which sometimes incumber and delay ordinary civil actions. In harmony with the manifest intention of the act, this court has held that the industrial board is not bound by the rules of court procedure in civil actions. (*Hagenback v. Leppert,* 117 N. E. 531)."

It was further said in the *Hege* case that the board had a right to consider the hearsay evidence which was admitted without objection, and give it such probative force as it might believe it merited, under all the facts and circumstances. In *Western Ind. Co. v. Industrial Acc. Com.,* 174 Cal. 315 (163 Pac. 60), it was held that a provision in the law permitting hearsay evidence of declarations of a deceased employee relating to his injury is not unconstitutional. In *In re Fogarty v. National Biscuit Co.,* 221 N. Y. 20 (116 N. E. 346), hearsay evidence was considered.

In the instant case, neither the board nor the commissioner gave any consideration to the hearsay evidence, since

it is not referred to, doubtless under the same mistaken view of the law that they expressed in holding that the affidavit could not be considered. We think this language is applicable, as applied to our statute, before set out, which provides that, in hearings before the arbitration committee or the commissioner, they shall not "be bound by common law or statutory rules of evidence." As said, this evidence was first drawn out by defendants on cross-examination of claimants' witness, wherein witness had stated that deceased was in the act of putting down the windows, when the storm struck. It is true that, on redirect examination, defendants objected; but the evidence was already in. Defendants may not now complain, after having brought out the evidence themselves. *Riordan v. Guggerty*, 74 Iowa 688.

2.   An affidavit is, in a sense, hearsay. Had the lower tribunals the right to consider the affidavit? We think so. It was so held in *In re Moran v. Rodgers & Hagerty*, 180 App. Div. 821 (168 N. Y. Supp. 410), where it was held that affidavits of parents in Ireland should be received, to prove dependency under the New York Compensation Act, which is somewhat analogous to ours, in so far as it relaxes, to some extent, the rules of evidence. Some of the discussion in Paragraph 1 of the opinion is applicable here; and we think that, under the statute before quoted, the board and commissioner had the right to consider the affidavit. It may be that they were not compelled to do so; but, as we have shown, it was not given any consideration, under a mistaken view of the law, and their finding was not based thereon. It is doubtless true that the board and commissioner have a discretion in the matter. Circumstances might be such as that they might require that the person should be called as a witness, if that were practicable, or possibly require the party, under the statute, to appear for cross-examination in regard to the statements in the affidavit, or perhaps, in a proper case, that the affidavit should be disregarded. We do not mean to hold

3.   MASTER AND SERVANT: Workmen's Compensation Act: ex-parte affidavits.

that these cases should be tried on affidavits. But here was an exceptional case. There was no other witness present with the deceased but Newquist. He was in the service, located in a distant state, and liable to be ordered to some other point at any time. So far as we know, he may have been in France, or on his way there, at the time the evidence was taken in this case. It would have been safer for defendant's employees, and a protection to their property from a windstorm, that the windows should be closed. It was the duty of deceased to close them. If it be true that he was in the performance of that duty, and, in attempting to protect the lives of the other employees, and defendant's property, he lost his life, ought his dependents to be deprived of the benefit of the evidence of Newquist, under the statute before quoted, simply because they were unable to produce him in person? We are clearly of the opinion that the affidavit should have been considered, and given weight in connection with the other circumstances, and that, as a matter of law, the board and commissioner erred in not considering it; and their finding that deceased was not so engaged, is without support. Our first thought was to remand the case to the district court, with directions to send it back to the commissioner, that he might make a finding of facts, taking into consideration the evidence referred to in the prior paragraph, and this paragraph of the opinion. But the evidence is all before us, and we think it is undisputed that deceased was putting down the windows at the time he was injured.

3. This brings us to the question whether deceased was killed by an act of God, and not by reason of an injury arising out of his employment. Appellees cite and rely upon *Griffith v. Cole Bros.*, 183 Iowa 415; *Pace v. Appanoose County*, 184 Iowa 498; and the statute, Section 2477-m, Code Supplement, 1913. They consider the injury by the windstorm, in this case, as like an injury from lightning; while appellants argue that there is a difference, for that a bolt of lightning is but an instant flash, while the windstorm in

4. MASTER AND SERVANT: Workmen's Compensation Act.

this case was seen in the daytime, for some time in advance, and could have been guarded against, and that the defendants did attempt to give warning, in order that deceased and others might escape to a place of safety. They say, further, that a storm of this kind could be seen a long distance, and guarded against, and that the delay of the defendants in giving the alarm was negligence on the part of defendant factory, and renders the so-called act of God no defense. On this, they cite *Holmquist v. Gray Construction Co.*, 169 Iowa 502; *Green-Wheeler Shoe Co. v. Chicago, R. I. & P. R. Co.*, 130 Iowa 123. Appellees say further that it is apparent that deceased, at work in defendant's factory, was under no greater hazard of being killed by the windstorm than any other citizen who was within the area of the storm; that he was not subjected to a causative danger, peculiar to the work and not common to the neighborhood; that, at the time of his injury, while in defendant's factory, he was subject to no other or different hazard than that to which he would have been subject, had he been sitting in church, within the area of that storm. This might be so, if there was a general destruction of all, or substantially all, buildings, churches, etc., in the path of the storm. Deceased and Newquist were the only ones injured. The president of the factory company says his purpose in sounding the gong was that those in the factory might escape therefrom, to a place of safety. There seems to have been more hazard for deceased at the place where he was, and where his duty required him to be, than in any other place. In 1 Corpus Juris 1172, a variety of definitions, differing somewhat in their mode of expression, is given. It is there said also that, in a popular sense, every occurrence is mediately or immediately an act of God. One definition is that it is an act of nature, which implies entire exclusion of all human agency,—that which is occasioned by the violence of nature,—and at page 1174, it is said:

"The principle embodied in all of the definitions is that the act must be one occasioned exclusively by the violence of nature, and all human agency is to be excluded from

creating or entering into the cause of the mischief. When the effect, the cause of which is to be considered, is found to be in part the result of the participation of man, whether it be from active intervention or neglect, or failure to act, the whole occurrence is thereby humanized, as it were, and removed from the operation of the rules applicable to the acts of God."

Again:

"If divers causes concur in a loss, the act of God being one, but not the proximate cause, it does not discharge from liability." 1 Corpus Juris 1176.

The wind is doubtless, as many other things are, according to the law books, an act of God. But here human agencies participated. For instance, the defendants made it the duty of deceased, and gave him directions, to be at this particular and more hazardous place, to put down the windows, when the alarm was given for the storm, as it approached, when the men were to be dismissed. Deceased was not struck by the wind itself, as a bolt of lightning might strike him, but by the falling wall, which was built by human agency, and not strong enough to withstand the wind; and was injured through lack of diligence in giving the alarm, perhaps, and other things shown in the record. There is no question of negligence in this case. These circumstances are referred to, to show that deceased was not injured solely by the act of God, but that there was some causal relation between the injury and the employment, a part of his employment being to close the windows; or, as said in *Pace v. Appanoose County*, 184 Iowa 498, "a causal connection between the conditions under which the work is required to be performed and the resulting injury," and, as stated in the *Griffith* case:

" 'The accident arose because of something I [deceased] was doing in the course of my employment, and because I was exposed by the nature of my employment [putting down the windows as the storm approached after the alarm was sounded] to some peculiar danger [the falling wall at that place].' "

In *Fiarenzo v. Richards & Co.*, 93 Conn. 581 (107 Atl. 563), it was held that the words "causal," "cause," and "proximate cause," are not employed in a technical sense, and that the act itself must be construed, and not decisions which may seem to limit the act. Under the circumstances here shown, surely deceased was subjected to "a causative danger, peculiar to the work, and not common to the neighborhood."

In *Ahern v. Spier*, 93 Conn. 151 (105 Atl. 340), it was held that the fact that the employee was not exposed to greater danger than others in the same employment is immaterial. We have such winds or storms here. Houses and factories are built somewhat with reference thereto, and of sufficient strength to withstand all ordinary winds. Not so as to lightning. The evidence does not show that the storm was an unprecedented one. This storm was seen approaching for some time prior to the accident, and some thought it was too high to do damage. It cannot always be known in advance how serious it may be. Sometimes they look dangerous, but nothing comes of it. But it was seen in time to take some precautions, and the president of defendant factory, after some delay, which he regretted, gave the alarm. His purpose was, as he says, in order that the men might escape from the more dangerous position in the building to a safer place—perhaps to a storm cave or cellar. At any rate, all did escape, except deceased and Newquist. Suppose all the circumstances were the same as here,— the directions and duty to close the windows, the alarm, the act of closing the windows, the falling wall, the injury, —but, instead of a windstorm, there had been a fire, could there be any question about deceased's having been injured in the course of his employment, and that the injury arose out of the employment? It is clear to us there could be no question about it. Or suppose the wall in question had been blown down by an ordinary wind, what ought the test to be? That there would be liability under the same conditions if the wind had a velocity of 20 miles an hour, but no liability if the velocity were 60 miles an hour? Mani-

festly, we may not lay down any definite rule. In *Andrew v. Failsworth Indus. Soc.*, 2 K. B. (1904) 32 (90 L. T. [N. S.] 611), an English case, where a bricklayer was killed by lightning, while working on a scaffold some 23 feet from the ground, it was held that the height of his position subjected him to a peculiar danger, and risk from lightning, and that his death arose out of his employment. This case is referred to in the *Griffith* case, at page 431, as being a case where a workman on a high scaffolding was kept at work during a storm. In a like sense, in the instant case, deceased was kept at work during this storm, in that he was directed by the defendants, and it was a part of his duty, to put the windows down for the storm. See other lightning cases cited in the *Griffith* case, at page 430. It is there said that:

"It is not intended to hold that injury from lightning can in no case be due to an industrial employment. It has been rightly said that they can be."

In the *Pace* case, supra, we quoted from the *McNicol* case as follows:

"It 'arises out of' the employment when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation, as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workman would have been equally exposed, apart from the employment. The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event, it

must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

The opinion also quotes from another case, as follows: "For an accident to arise out of and in the course of the employment, it must result from a risk reasonably incidental to the employment."

And we said in the *Pace* case:

"What the law intends, is to protect the employee against the risk or hazard taken in order to perform the master's task."

In the instant case, under all the circumstances shown, the danger was incidental to the character of the business and the protection of the property and the lives of other employees; it was not independent of the relation of master and servant; deceased would not have been equally exposed to the same danger apart from the employment; the risk or hazard taken by deceased was in order to perform the master's task; there was causal connection between the conditions under which the work and the duties of deceased were required by defendant to be performed, and the resulting injury; the accident resulted from a risk reasonably incidental to the employment and the duties of deceased thereunder.    Applying the doctrine of the foregoing case to the instant case, we think the injury to deceased arose out of and in the course of his employment.    Other cases are cited by appellants on this point, which they say are somewhat analogous, but they concede that they are not entirely so.    We shall not stop to review them, but simply cite them.    *State v. District Court,* 138 Minn. 131 (164 N. W. 585) (freezing) ; *State v. District Court,* 138 Minn. 260 (164 N. W. 917) (sunstroke) ; *Kanscheit v. Garrett Laundry Co.,* 101 Neb. 702 (164 N. W. 708) (heatstroke) ; *Young v. Western Furn. & Mfg. Co.,* 101 Neb. 696 (164 N. W. 712) (heatstroke).    Other cases where this question is discussed, are *Rayner v. Sligh Furniture Co.,* 180 Mich. 168 (L. R. A. 1916 A, 22), and note at pages 40 and 232.    In this note at page 40 it is said:

"The determination of this question presents one most difficult problem in connection with the act. It has been said that each case must depend upon its own circumstances, and cannot be solved by reference to any formula or general principle."

Cases are cited to support the proposition. See, also, in connection with the Minnesota and Nebraska cases above, L. R. A. 1917 D, 114, note. It is said in *Kunze v. Detroit Shade Tree Co.*, 192 Mich. 435 (158 N. W. 851, L. R. A. 1917 A, 252), that, where employees are traveling on the streets, it may be taken into account that they are subjected to the danger of being struck by street cars, automobiles, etc. The court said:

"Deceased received his injury during the hours of employment, while actively engaged in performing work for his master, in accordance with duties imposed upon him by his employment."

In *Mahowald v. Thompson-Starrett Co.*, 134 Minn. 113 (158 N. W. 913), where an employee was kept on the street, in charge of his employer's team, subjecting him to the dangers of collisions with other teams, runaways, etc., the court said:

"If his employment as a teamster upon the streets of a large city, where he not only had to look out for his own safety, but also for that of his employer's team and rig, necessarily accentuated the street risks to him, above those to other occasional travelers, it suffices for the conclusion that this accident arose out of his employment. Although the risk from the accident in question may be said to be external to the employment, yet the employment caused a special degree of exposure to this risk."

See, also, *Brightman's Case*, 220 Mass. 17 (L. R. A. 1916 A 321), where the death was from heart disease of a cook upon a boat, due to exertions in saving his personal effects when the vessel began to sink. *Held* that the death arose out of and in the course of his employment. The court said:

"It was an implied term of such service as this that the employee might use reasonable effort to this end in an ex-

igency like that which arose. * * * It was in the course of his employment to live upon the lighter. Whatever it was reasonable for anyone to do, leaving a sinking vessel which was his temporary home, was within the scope of his employment. The standard to be applied * * * is that which the ordinary man, required to act in such an emergency, might do, while actuated with a purpose to do his duty. * * * In the case at bar, there may be found to be apparent to the rational mind a causal connection between the employment and the thing done by the employee at the time of the sinking of the lighter."

Other instances where it was held that the injury arose out of and in the course of the employment are: *Pekin Cooperage Co. v. Industrial Commission*, 285 Ill. 31 (120 N. E. 530), where there was an assault by one employee upon another, the dispute concerning the employer's work; *Rowland v. Wright*, 1 K. B. (1909) 963, where a workman was bitten by a cat habitually kept on the premises; *Barone v. Brambach Piano Co.*, 101 Misc. Rep. 669 (167 N. Y. Supp. 933), where an employee was bitten by a dog kept with the consent of the employer in part of the premises where employee's duties required him to go; *Nevich v. Delaware, L. & W. R. Co.*, 90 N. J. L. 228 (100 Atl. 234), employee assaulted while reclaiming his employer's property by his direction; *Baum v. Industrial Commission*, 288 Ill. 516 (123 N. E. 625), where a workman voluntarily performs an act during an emergency, which he has reason to believe is in the interest of his employer. In that case, the employee was fatally wounded by strikers, while he was trying to save his employer and other employees from injury. *Mueller Con. Co. v. Industrial Board*, 283 Ill. 148 (118 N. E. 1028), where a foreman, a half hour before time to begin work, went to another building to telephone for lumber, and was struck by an automobile. *Held* that ordering materials was an incidental duty, in discharging which the use of the telephone in a near-by building was as much in the course of his employment as if a telephone had been installed in the building under construction, and was being used by the

employee. In *In re Fogarty v. National Biscuit Co.*, 221 N. Y. 20 (116 N. E. 346), the court held that the position of night watch was exposed to the dangers of the bakery business. The court said:

"This court has given a more liberal construction to the compensation law, and held that, 'where  *  *  *  an employee is injured while performing an act which is fairly incidental to the prosecution of a business and appropriate in carrying it forward and providing for its needs, he or his dependents are not to be barred from recovery because such act is not a step wholly embraced in the precise and characteristic process or operation which has been made the basis of the group in which employment is claimed.' *Matter of Larsen v. Paine Drug Co.*, 218 N. Y. 252, 256. The principle has been extended to cover injuries to night watchmen. *Matter of White v. New York C. & H. R. R. Co.*, 216 N. Y. 653, affirmed in United States Supreme Court, 243 U. S. 188 (61 L. Ed. 667)."

As a matter of law, on the undisputed evidence before us, we are of opinion that defendants are not relieved from the payment of compensation on the ground that deceased was injured and killed by the act of God. We are of opinion that he was injured in the course of and that the injury arose out of his employment, and that claimants are entitled to compensation. Wages of deceased, and the amount he was contributing to claimants, and the other elements necessary as a basis for the allowance of compensation, were shown or conceded before the board; but this feature of the case has not been argued, and we shall not stop to figure it out. The cause is reversed and remanded to the district court, with directions to allow compensation in accordance with this opinion, and the law and the evidence.— *Reversed and remanded.*

WEAVER, C. J., and EVANS, J., concur.

SALINGER, J., concurs specially.

SALINGER, J. (concurring).   No distinction should be
based on the fact that one injury was caused by the act of
God in creating a windstorm, and that another was due to
the act of God in creating lightning.   Nor do I deem the
naked fact that injury was caused by any act of God to be
controlling.   And nothing in *Griffith v. Cole Bros.* militates
against a recovery in the case before us.   That case dis-
tinctly holds that death from being struck by lightning may
be compensable.   The test is not whether the injury was
caused by an act of God, but is whether the one injured was,
by his employment, specially endangered by the act of God,
be it lightning or windstorm.   This decedent was more ex-
posed to such injury than mankind generally.   If an ap-
proaching storm seemed threatening, it was his duty to
close windows.   That might keep him in the path of the
storm after his fellow employees had left the building and
gotten out of the path of the storm.   I base my concurrence
on the fact that the nature of the employment was one that
forced the employee to be specially subject to the danger
from certain acts of God.