VIRGINIA DeLONG et al., by MARY E. SAMPSON, next friend, Appellees, v. IOWA STATE HIGHWAY COMMISSION et al., Appellants.

No. 45356.

DECEMBER 10, 1940.

REHEARING DENIED MARCH 14, 1941.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellees.

John M. Rankin, Attorney General, and G. H. Clark, Jr., Special Assistant Attorney General, for appellants.

BLISS, J.—The appellants will be referred to in the singular, or as the Commission, the industrial commissioner as the commissioner, and the deputy commissioner as the arbitrator.

The deceased had been in the employ of the highway maintenance department of the Commission as a common laborer since sometime in the year 1933. His work was largely in Clarke county. His last day of service was on October 28, 1936. He was taken from his home on November 1, 1936, to the Osceola Hospital, maintained by Dr. H. E. Stroy, and in which Mary E. Sampson, the "next friend" of the plaintiffs, was the super-

intendent, bookkeeper and X-ray technician. He remained at the hospital until his death on November 18, 1936, from general septicemia, or blood poisoning.

No notice, demand or claim, either written or verbal, was ever made upon the Commission or anyone connected therewith by the employee or his dependents, or anyone in their behalf, for any benefits under the compensation act until L. L. Clement, in charge of all compensation cases for the Commission, received a letter from the appellees' attorneys on this appeal, dated November 20, 1937, stating that DeLong had received an injury and inquiring about compensation in 1937. On September 21, 1938, almost two years after the alleged injury, the petition for arbitration was filed with the commissioner. It alleged that on or about September 28, 1936, DeLong, while using a compressed air drill to break paving, sustained injuries to his left hand, "either from the operation of the air drill or the hammer or some other part of the implement." The petition also alleged that the said bruise to his hand was further injured on or about October 28, 1936, and aggravated. We state here that the record does not sustain this allegation of further injury or aggravation of the injury on or about October 28th, or subsequent thereto. The petition prayed for an award of $15 a week for 300 weeks, and for funeral, medical, and hospital bills. These bills, including those of Doctor Stroy and his hospital, were unpaid.

The answer of the Commission admitted the allegations as to employment, dependents, and death. It set out the amount of his wages, denied that the injury or death arose in the course of or out of the employment, and denied any notice to or knowledge by it that there was any proximate causal connection between the employee's death and his employment, as contemplated by Code section 1383.

We need give no consideration to the matter of notice or knowledge as a bar to the claim under this section, since the commissioner held with the claimants on this issue. In referring to claimants' testimony thereon, the commissioner said that "it may be admitted [it] is quite unusual, and may be questionable whether or not it was sufficient to comply with the provisions of the law, * * * we are constrained to believe that while the weight

of the evidence is not entirely free from doubt, much of which may be due to lapse of time * * * we are of the opinion claimant sustained the burden of proof in that respect, but in this the question upon whom the burden of proof may rest is not free from doubt. We are constrained to believe that want of such notice is an affirmative defense and if that be true the burden of proof would rest upon the defendant.'' The Commission did not appeal from this decision.

The contention of the appellant in this court is that the appellees failed to establish by a preponderance of the evidence that the disability and death of the employee were caused by a personal injury arising out of and in the course of his employment; that the finding and decision of the commissioner that the appellees had so failed is conclusive; and that the trial court was in error in trespassing upon the jurisdiction and authority of the commissioner in its fact finding contrary to that of the commissioner, and in entering final judgment reversing the decision of the commissioner. One of the elements of this contention of the Commission is that there is no support for the claim of the appellees that the disability and death arose out of and in the course of the employment other than hearsay testimony, consisting of testimony of the three plaintiffs and of Doctor Stroy of declarations made to them by DeLong as to the cause of the disability of his left hand. Our careful examination of the record confirms this statement that the sole proof lies in these declarations.

In answer to the appellant, the appellees urge that the testimony of Doctor Stroy that the declaration of DeLong made to him a few days after the alleged injury was a part of the clinical history of the case, given to him for the purpose of diagnosis and treatment, and that it was not hearsay, but was substantive evidence of the facts declared. The appellees also contend that, if the testimony be conceded to be hearsay, it was in the record for what it was worth, and that appellant cannot complain of its admission, because it made no objection that it was hearsay, or no motion to strike on that ground, and some of the declarations were again brought out by it on cross-examination. Appellees also insist that the facts in the record are not disputed and that there is no sufficient, competent evidence to

warrant the making of the commissioner's decision; that the commissioner erred in his legal conclusion as to the inadmissibility of the declarations, and that in reality he made no finding of fact. Appellees also urge, as did the trial court in its opinion, that regardless of what may have been the initial cause of the lesion on the left hand of DeLong, there was competent evidence that it was re-injured and aggravated and the infection was scattered through his system by the work which he was doing.

In order that our decision and the respective contentions of the parties may be better understood, we deem it necessary to summarize some of the material and relevant testimony. The Commission maintained a crew of six men to repair the pavement where it heaved or sank. It operated over a district of several counties under a foreman. Its equipment consisted largely of a concrete mixer and an air compressor operated by a gasoline motor, and a drill or hammer operated by compressed air, which was used in breaking the defective paving. The breaking implement consisted of a hollow metal sleeve or cylinder with horizontal handles on each side fastened at its top. A rubber tube extended from the compressed air tank and opened into the cylinder of the implement just described, just below the handles. The hammer or chisel bit, as it was called, was inserted and fastened in the opening at the bottom of the cylinder. The bit being used weighed about 90 pounds. The operator would admit the air into the cylinder by a trigger valve in the hose near the handles. The impulsions of air caused the hammer or drill to strike about 20 or 25 times a second. The whole implement necessarily vibrated, but only the piston would rise and fall, not the handles. The handles had a rubber covering or cushion around them. The operator did not have to hold it tight, but merely moved it as needed, and just balanced it to hold it up. On cross-examination by appellees, the foreman of the crew said that he never heard of an operator getting sore hands in using it. About September 15, 1936, DeLong was taken from the regular maintenance crew in Clarke county to work with the pavement-breaking and repair crew in Decatur county. He traveled daily to and from his home in his work. He alternated with the other members of the crew in operating the pavement breaker. Mr. Hood, of Council Bluffs, was the foreman of the breaker

crew. He testified that after quitting time on September 26 or 27, 1936, about two days before the breaker crew completed its work in Decatur county, DeLong rode with him from the work to Osceola. He testified that he noticed "a little red pimple on his hand, it was just small then." He asked him if it hurt or bothered him in his work and he said that it did not, and he said nothing about what it was, or whether he hurt it in his work. He worked the next day without any apparent trouble. The next day he left Hood's crew and rejoined his own in Clarke county. Mr. Perry, of Creston, a division maintenance engineer, testified that on September 29, 1936, DeLong rode with him from Leon to Osceola and called his attention to a red spot on the back of his left hand and said that it hurt him some. He said nothing about receiving an injury, bruise or anything of that sort. Later he saw him in Clarke county and DeLong said it was a boil or carbuncle. Mr. Karns was his foreman in Clarke county. He testified that DeLong resumed his work with him in Clarke county about September 28th or 29th and worked every work day, except possibly one day, up to and including October 28, 1936; that during all of this time he never operated a drill or pavement breaker of any kind; that he did not use or have such an implement in any of the work of his crew; that he saw a mark on the back of DeLong's left hand; that he spoke of his hand being sore and that he thought it was going to be a boil and that was all he said about it, and he never, at any time, said he suffered an injury in working on the pavement breaker, or in any work on the job; that he believed he noticed his hand the same day he quit in Decatur county, or the next day; that, in order that he might get in his hours and not suffer, he put him to work as a flagman, flagging traffic, and that on October 28, 1936, the last day he worked, he put in the full day lining or citing posts for snow fences. Arthur Allen worked in the crew with DeLong from September 29th until October 28th, and he told him he had a carbuncle on his hand. He told Willard Tanner, another of his co-workers, the same thing. The foremen, Hood, Perry and Karns, testified that no claim under the compensation act was ever made by or on behalf of DeLong or the plaintiffs.

Doctor H. E. Stroy, who had been the physician of DeLong

and his family, testified that DeLong came to his office on September 30, 1936, and showed him a swollen place on the back of his left hand, "about as big as a dime or gave the appearance of a half of a hazel nut. Right on the middle, back of the middle of his hand, corresponding to the back of the metacarpal bone. The place was reddish in color, red and tender, gave the signs of an acute inflammatory lesion of bluishness around the edges. Very hard." There was no abrasion or breaking of the skin. In answer to a question as to whether he got "a history of what had happened to him at that time," he replied:

"Yes. I made a notation on the original visit that he had sustained a bruise from an air drill that he had operated on his highway work just—I didn't get the exact time before, but a few days prior to that, which he said accounted for the swelling."

There was no objection to the question or motion to strike the answer. Then followed this:

"Q. Was it your judgment that the condition was at that time the result of some bruise or injury he had recently received? Mr. Clark: At this time we object to the question as being incompetent, irrelevant and immaterial, calling for a conclusion, hearsay." The objection was overrruled. "A. Yes, I had no reason to doubt his statement."

Upon motion being made to strike the answer for all of the reasons urged in the objection, upon suggestion of appellees' counsel, the deputy commissioner struck all of the answer but the word, "Yes." The question was not vulnerable to the objection of "hearsay", as it called for the professional judgment of the doctor based upon his examination of the lesion, but it will be noted that his answer was not based upon his professional knowledge or judgment, but was bottomed solely upon the declaration of his patient, including the word, "Yes." Notwithstanding he stated that DeLong told him the lesion was caused by a bruise, he diagnosed it as a boil or carbuncle. He put nothing on it but a dressing or poultice of Epsom salts to localize the inflammation or infection and draw it to a head. He next dressed it on October 3d, "and by that time the lesion on the back of his hand had perforated the skin and there was a yellow slough right over the

bone that gave the appearance of a carbuncle and I proceeded to remove some of the slough but didn't get it all out and put another dressing on. I didn't take out the core at that time. I gave him no medicine and put no medicine on the dry dressing. I saw him next on October 5th at my office. I just dressed his hand, that is all the notation I have here, that was probably all that was necessary at that time. I presume it was progressing satisfactorily. I put a dry dressing on again. The fourth trip was on October 7th. I took the core out at that time leaving the underlying structures of the hand exposed, tendon and bone. I couldn't see the bone but could probe and feel it. It was an angry looking hole, had ulcerated on the back of his hand. I put no medicine on it, just a dressing. I saw him following that on October 8th at my office. I put a dry dressing on it apparently seemed to be progressing satisfactorily, the soreness was subsiding and I thought possibly he could take care of the dressing himself after that and he thought he could too. I put on a dry dressing at that time.''

In his cross-examination respecting this stage of the treatment, this appears:

''Q. It wasn't until the last of October or first of November or thereafter that you decided it might involve some other condition [than a boil], isn't that right? A. No, I believe that after I removed his core [October 7th] and probed the bottom of that thing and the tendon and the bone was exposed [October 7th], I didn't say that it was osteomyelitis but I suspected it was and, of course, naturally I couldn't say it was definitely until it didn't heal, that is characteristic of an osteomyelitis.''

He testified that an osteomyelitis was an infection of the bone or under the lining of the bone, the periosteum, that usually results from trauma or a bruise, or injury.

''The majority of cases of osteomyelitis will eventually heal after the dead bone has been extruded or they can be hurried by incising the bone and scraping out the dead bone. There is usually bone destruction in osteomyelitis but a wound of that kind will not heal as long as there is dead bone underneath it.''

Notwithstanding these suspicions of osteomyelitis, which, at the arbitration in February 1939 he claimed he had on October

7, 1936, and notwithstanding the slender metacarpal bone just beneath the skin was then exposed to his view and was readily accessible to the proper treatment of "extruding", "incising", or "scraping", he did none of these things, even though the wound would never heal if his suspicion was correct and the treatment was not given. Instead, he dismissed the patient from his care the very next day. We mention these matters not in criticism of his professional care of the case, but as matters which the commissioner very likely took into consideration in reaching his decision.

On direct examination, he testified that the next time he saw the patient was at his office on October 28th. The patient had been dressing it, but it hadn't healed. The wound was open and the metacarpal bone was accessible and "it was *rough* and more than likely was an osteomyelitis", yet he did not give the bone the treatment which he said the disease called for. Instead, he put mercurochrome on the wound. According to his testimony, he was again suspicious that he had an osteomyelitis. He put on another dressing at his office on October 30th. On November 1st he was called to the DeLong home. He took his temperature for the first time. It was 103 degrees. His right foot was swollen and inflamed. His diagnosis was that some of the bacteria from the hand had infected a bone in his foot. The patient was taken to the hospital. We have before us photostats of the hospital clinical analysis chart, graphic temperature, pulse and respiration charts, and bedside charts for almost every hour of the 18 days the patient was in the hospital. There is no mention in any of them of the left hand of the patient or of any treatment given to it. Notwithstanding no treatment for osteomyelitis was given to the hand, which Doctor Stroy said was essential for healing, he testified that "the hand didn't heal until just before he died, it wasn't even healed good then." Under date of November 6th, there is the notation: "Incision made in 'R' foot on outside—pus." On November 7th, this notation appears: "Incision made in 'R' ankle on outside. Purulent drainage." On November 9th is the notation: "Incision made in 'R' foot by Dr. Stroy. Fair am't. fluid drainage." The clinical analysis chart shows staphylococcus pus from the foot. Counsel for appellees comment on

the fact that the pus was "definitely" staphylococcus. However, this fact is of little significance. Doctor Stroy testified that staphylococcus is the "organism that causes *carbuncles* and *boils,* osteomyelitis and several other infections." Webster's New International Dictionary speaks of the staphylococci as "one of the commonest parasitic bacteria and the usual agent causing acute suppurative inflammations, as boils, abscesses, etc." The word osteomyelitis appears for the first time in connection with the disability of Mr. DeLong in the testimony of Doctor Stroy at the arbitration hearing in February 1939. After the letter of appellees' attorneys to the Commission in November 1937, Mr. Perry, heretofore referred to, requested Doctor Stroy for a medical report on the case, and on December 6, 1937, the doctor wrote to Mr. Clement describing the hand as he saw it on September 30, 1936, and stated "by October 3 the lesion broke through the skin and gave the appearance of a carbuncle with a slough formation." The letter then described the septicemia which developed in the foot, but nowhere is there any mention of osteomyelitis.

Another dispute in the record as between Doctor Harnagel, an expert witness for the Commission, and Doctor Stroy is with respect to the cause of boils and carbuncles. The latter defines a boil as "simply a hair follicle infection of the skin and a carbuncle is several hair follicle infections of the skin all contiguous." Doctor Harnagel agrees in substance with these definitions, but definitely disagrees with Doctor Stroy's statement that "it would be highly probable it [a boil of this kind] did arise from an injury or bruise", by stating "boils and carbuncles do not arise from injury; from the very nature of them, they cannot arise from injury."

Under the questioning of appellees' counsel in redirect examination, the answers of Doctor Stroy show the following marked change on a very vital question:

"Q. Doctor, in addition to his history of the case, what indications could you see on the hand there of injury the first time you saw him? A. He had this red swelling, it *could* have been a boil, it *could* have been a bruise, it *could* have been a hemorrage under the periosteum. It *could* have been any of these.

"Q. *.* * but I ask you whether or not there were indications you could see there was an injury? A. It looked like it *could* have been an injury.

"Q. Basing your opinion from your examination of him and his subsequent condition and health and so on, *it was an injury and the result of an injury?* A. There is no question in my mind but what an original bruise produced his fatal trouble."

If this testimony was in the record without testimonial dispute, its weight, credibility and probative effect was for the determination of the commissioner. But doubt is thrown on the last answer by the testimony of Doctor Harnagel, to wit:

"Q. Doctor, might there accrue an infection or the introduction of bacteria in such a boil or carbuncle when it breaks out on the surface that would cause a generalized infection? A. The bacteria may at any time enter the blood stream and in that way cause generalized infection, septicemia, lesions in other parts of the body.

"Q. Now assuming a case where a man has a boil or carbuncle * * * and that some twenty days later this case develops an osteomyelitis of the bone immediately beneath this so-called boil or carbuncle, could that be traceable to the boil or carbuncle or to some other systemic deficiency? A. In that case it would be most likely that the infection had gained entrance into the blood stream and had lodged in the bone, that is not an uncommon experience, not necessarily in the entry of the boil or carbuncle but in any part of the bone system."

The only testimony, in addition to that of Doctor Stroy, as to the cause of the disability of the deceased is the hearsay testimony of his children, aged 20, 15, and 12 years. The elder girl testified that when her father came home from the doctor's office with his hand bandaged "he told me he had been operating a drill for the Commission and he had injured his hand", and "that he saw the doctor not more than three days after he received the injury." She and her brother and sister also testified that their father was in bed at home during the entire week before he went to the hospital on November 1st. There is con-

siderable testimony definitely to the contrary. They also testify that during the forepart of this week, when their father was sick in bed, his foreman, Karns, called at the home one evening, and each child testifies in substance that they heard their father tell Karns that "he had injured his hand in his drill, that it pained him and that sometimes the drill shook him so badly he could hardly stand it." Mr. Karns positively denies that DeLong was sick in bed that week and states that he worked all of that week up to and including October 28th. He denies that he called upon DeLong at the time the children state and denies that any such statement was then, or at any time, made to him by DeLong. It is true that no objection was made to this testimony and some of it was repeated in cross-examination.

I. The question of the weight and effect to be given hearsay testimony in compensation cases has been before us a number of times, and in some of those cases hearsay testimony has been admitted without objection, or in cross-examination by the adverse party. But in no case have we permitted the cause of the disability, or any other essential fact element, to be established solely by hearsay testimony, unsupported by other competent corroborative evidence of recognized probative character, or by surrounding circumstances and proper inferences therefrom. We have given full effect to the legislative intention expressed in Code section 1441, but the effect and trend of our decisions in compensation cases has been that "in the end there must be a residuum of legal evidence to support the claim before an award can be made." (Carroll v. Knickerbocker Ice Co., 218 N. Y. 435, 440, 113 N. E. 507, 509, Ann. Cas. 1918B, 540.) This is true regardless of how the hearsay testimony came into the record. It is true that an exclusionary rule of evidence not invoked is waived, 1 Wigmore on Evidence, 2d Ed., section 18, page 173, and that objectionable testimony, including hearsay, not objected to, is in the record for consideration. The authorities are numerous. See Barlow v. Verrill, 88 N. H. 25, 183 A. 857, 104 A. L. R. 1126, with annotation, page 1130. We have so held. See Goodale v. Murray, 227 Iowa 843, 860, 861, 289 N. W. 450, 458, 459, 126 A. L. R. 1121 (hearsay); Reid v. Automatic Electric Washer Company, 189 Iowa 964, 179 N. W. 323 (hearsay); Hamilton v. Johnson & Sons, 224 Iowa 1097, 276

N. W. 841 (hearsay); Kissling v. Monticello State Bank, 203 Iowa 62, 64, 212 N. W. 314, 315 (conclusion); Lane v. Varlamos, 213 Iowa 795, 239 N. W. 689 (no proper foundation); Riordan v. Guggerty, 74 Iowa 688, 691, 39 N. W. 107, 108 (objectionable testimony on cross-examination). We have held that secondary evidence not objected to becomes in effect primary evidence. The Iowa Homestead Co. v. Duncombe, 51 Iowa 525, 1 N. W. 725; Moore v. McKinley, 60 Iowa 367, 373, 14 N. W. 768, 771; Jaffray & Co. v. Thompson, 65 Iowa 323, 21 N. W. 659; Kenosha Stove Co. v. Shedd, 82 Iowa 540, 544, 48 N. W. 933, 934; Buettner v. Steinbrecher, 91 Iowa 588, 592, 60 N. W. 177, 178. But hearsay testimony is in the record only for what it is worth. Failure to object to it cannot add to its probative force. Howsoever hearsay testimony may be in the record, it is there with the same intrinsic weaknesses which are the basic grounds for the general rule excluding it. 20 Am. Jur., section 452, page 402; Shaw v. McKenzie, 131 Me. 248, 160 A. 911; Poliner v. Fazzino, 105 Conn. 350, 135 A. 289; 104 A. L. R. 1130 et seq., supra.

One of our late compensation cases touching this subject is Schuler v. Cudahy Packing Co., 223 Iowa 1323, 275 N. W. 39. The commissioner set aside the compensation award of the arbitrator and the trial court, and this court affirmed. The claimant died from septicemia from a scratch on his finger. There was no direct evidence as to when or where the injury was received. Over objection, the deputy commissioner permitted the doctors who treated him to testify to his declarations that he received the injury in the course of his employment. The court, speaking through Justice Donegan, said, at page 1330 of 223 Iowa, page 42 of 275 N. W.:

"Appellant has not cited and we have not found any authority supporting her contention that hearsay evidence is admissible and competent to prove any of the basic facts in a compensation case. Without the hearsay evidence introduced in this case, we find no other competent evidence to sustain the burden imposed upon claimant to prove that the injury that resulted in her husband's death arose out of and in the course of his employment."

In Swim v. Central Iowa Fuel Co., 204 Iowa 546, 548, 549, 215 N. W. 603, 604, we said:

"Does the said statutory provision [section 1441] dispense with the necessity for legal evidence to support a claim or to negative the basis in support of such claim? It is true that the legislative intent in the enactment of our Workmen's Compensation Law is to afford an efficient and speedy tribunal to determine and award compensation under the terms of the act. Nevertheless, there must be found in the record evidence of a competent and recognizable probative character, to sustain the granting or the denial of an award. * * * We cannot agree to the proposition that the rule against the admission of hearsay evidence as proof of a fact is a mere technical rule of evidence. The rule against hearsay evidence is more than a mere artificial technicality of law. It is founded upon the experience, common knowledge, and conduct of mankind."

In Featherson v. Continental-Keller Co., 225 Iowa 119, 279 N. W. 432, the claim was denied by the arbitrator and the commissioner. The district court reversed and was in turn reversed by this court. Claimant testified that her husband told her he had fallen at the store while loading a rug. In holding that there was no competent proof of the claim, Justice Sager, for the court, said, at page 126 of 225 Iowa, page 436 of 279 N. W.:

"Defendant likewise argues that claimaint's case with reference to the injury having happened in the course of the employment is based entirely upon hearsay and incompetent evidence, with no direct testimony whatsoever to sustain it. We agree with this contention, but it is not necessary to analyze in detail the record in this regard. It is sufficient to say that no one appeared to testify that he witnessed the accident, and the only basis for the claim that it happened in the service of the defendant is testimony of claimant and others as to what Featherson said."

In Royal v. Hawkeye Portland Cement Co., 195 Iowa 534, 192 N. W. 406, the award for claimant by the deputy and the commissioner was affirmed by the district court and this court.

There was incompetent evidence as to proof of dependents which was admitted without objection, but it was supported by competent direct testimony. The court said, at page 540 of 195 Iowa, page 408 of 192 N. W.:

"Of course, the provision in the Compensation Act abolishing the common-law and statutory rules of evidence does not dispense with the necessity for legal evidence in support of a claim. Renner v. Model Laundry, C. & D. Co., 191 Iowa 1288 [184 N. W. 611]. In the Renner case, we quote with approval from Carroll v. Knickerbocker Ice Co., 218 N. Y. 435 (113 N. E. 507), where the court, construing a statute quite like ours, said:

" 'There must be in the record some evidence of a sound, competent, and recognizedly probative character, to sustain the findings and award made; * * * ' "

In Califore v. Chicago, St. P., M. & O. R. Co., 220 Iowa 676, 263 N. W. 29, the court, speaking through Justice Parsons, somewhat by way of dictum, since the declarations were held to be part of the res gestae, said, at page 679 of 220 Iowa, page 31 of 263 N. W.:

"It is urged, however, that a case cannot be proven solely by incompetent hearsay testimony. This is true, and needs no citation to support it."

In Baker v. Roberts & Beier, 209 Iowa 290, 293, 228 N. W. 9, 10, the court, in speaking of Code section 1441, said:

"Manifestly, the legislature did not contemplate that all ordinary rules of evidence and procedure may be disregarded by the industrial commissioner."

In Hinrichs v. Davenport Locomotive Works, 203 Iowa 1395, 214 N. W. 585, a letter was admitted over the objection that it was "incompetent, immaterial, and irrelevant." It was clearly hearsay but that objection was not made. It supported the claimant. This court held that it was not admissible and should have been given no consideration, but that there was sufficient other competent evidence to sustain the award. In O'Neill v. Sioux City Terminal Ry. Co., 193 Iowa 41, 186 N. W.

633, incompetent evidence was introduced over objection, but we held that there was sufficient competent evidence aside from that. In Hamilton v. Johnson & Sons, 224 Iowa 1097, 1110, 276 N. W. 841, 848, no objection that it was hearsay was made to a letter of Doctor Pearson's. But there was other competent evidence in the record to sustain the judgment of the district court for the claimant, as indicated by the statement of Justice Stiger that:

"Though this report in the absence of objection was admissible, Dr. Pearson gave the same testimony in his direct examination which was considered by the court and no prejudice resulted to appellants."

The decision most strongly relied upon by appellees is Reid v. Automatic Electric Washer Co., 189 Iowa 964, 179 N. W. 323. In that case, a severe windstorm suddenly arose and the signal was given for all the employees to leave the building. The deceased, whose duty it was to close the windows, and who could readily have escaped, was seen to turn back in the building. His body was found under debris where he would have been if he were closing a window. Another workman, Newquist, was helping him close the windows and was caught under the same debris but escaped without serious injury. He told the decedent's father of this, and on cross-examination the appellant-employer brought out what Newquist told the father about it. Newquist was in the army at the time of the hearing and his location was not known. The court referred to the fact that he may have been in France or on his way there. He was the only eyewitness and he was not available to testify, neither was it practicable to take his deposition. His affidavit stated that claimant was closing the windows when injured. This court was of the opinion that the affidavit should have been considered. The court said, at page 973 of 189 Iowa, page 327 of 179 N. W.:

"The hearsay evidence on that point [the father's testimony] went in without objection, and the affidavit was admitted over objection. But it is plain that both the committee and the commissioner considered and held, as a matter of law, that the affidavit could not be considered; and it is equally apparent that

no consideration was given by either to the hearsay evidence or to the affidavit. If they were laboring under a misapprehension as to the law, and for that reason did not consider the evidence, and if either or both may be considered, and establish the fact, then it becomes a question of law for us.

"The record as to both matters is before us; and if they may, under the circumstances, be considered, then there is no dispute in the evidence on the point as to what deceased was doing, and it becomes our duty to enter such decree as will enforce the legal rights of the parties, as disclosed by the facts appearing in the record."

However, the court was not compelled to, and it did not, base its decision upon the hearsay testimony. It said, at page 974 of 189 Iowa, page 327 of 179 N. W.:

"But we think there is more to the evidence than this, even outside the hearsay statements and the affidavit. It seems to us that, considering all the circumstances and the proper inferences to be drawn therefrom, the other proof comes very near establishing; if, indeed, it does not establish, the fact that deceased was in that act, and in the performance of his duty. It appears without dispute that the purpose in sounding the alarm was that the employees might escape to a place of safety; that all others but deceased and Newquist got out of the factory safely, and were uninjured; that deceased was near the west entrance, and doubtless could have escaped as well as the others, but he turned back; that he was found buried under the debris, near the place where he would naturally be in closing the windows; that it was his duty to close them, and the presumption is, not that he was not in the performance of his duty, but rather that he was. Holland-St. Louis Sugar Co. v. Shraluka, 64 Ind. App. 545 (116 N. E. 330, 332). But conceding, *for the purpose of the argument,* that all these circumstances do not quite establish the fact, slight evidence would be sufficient, *if undisputed,* to connect up the other circumstances. We think the statements of the father, though hearsay, admitted as they were, and the affidavit, clearly make the connection, and establish the fact." (Italics ours.)

In the Reid case every fact, circumstance and reasonable

inference supported the claim. There was no dispute as to any of these matters. There was direct testimony that he was seen returning, and his body was found near the window which it was his duty to close. While in the case before us, as disclosed by the statement of facts, the evidence supporting the claim is not only disputed by direct testimony, but by inconsistent statements and conduct on the part of the deceased, and weakness and improbability in testimony supporting the claim, which detracts from the probative value.

II. Appellees insist that the statement made by Mr. DeLong to D**.** Stroy as to the cause of his injury was not hearsay, but was substantive evidence of the facts stated, since it was made to the doctor to aid him in the diagnosis and treatment of his disability. They are in error in this. They cite in support of their contention our recent case, Mitchell v. Montgomery Ward & Co., 226 Iowa 956, 285 N. W. 187, and State v. Blydenburg, 135 Iowa 264, 273, 112 N. W. 634, 638, 14 Ann. Cas. 443. Neither case sustains the point. In the case first named, the sole question for determination was whether a doctor who had never treated the litigant, but who examined her a few days before the trial, solely to qualify himself as a witness in her behalf, could testify as to what she told him were the facts as to the cause of, and how and when she received the injury. We held that the testimony was not admissible for that purpose. All deductions from any language in the opinion must be drawn in the light of the issue under consideration. In the Blydenburg case, the witness was the doctor who had treated the patient. In stating to him the history of her case, she told him of her previous physical condition. The doctor had been put on the stand by the defendant to show that the patient had died from uremic poisoning, and not from a poison externally administered. This court held that the doctor was entitled to tell the jury the facts on which he based his opinion, rather than just his bare conclusion, so that the jury might have some intelligent conception of the basis of his diagnosis. The recitation of the facts which DeLong stated to Doctor Stroy was admissible for that purpose, and had the objection of hearsay been made it would have been rightly overruled. But the testimony was hearsay, and not substantive, testimony, with respect to proving the truth of the statements which Mr. DeLong made,

and the Blydenburg case does not hold to the contrary. This court recently passed upon this question. In Schuler v. Cudahy Packing Co., supra (223 Iowa 1323, 275 N. W. 39), Doctors Keeffe and Hanson treated claimant's intestate. Over objection both testified that he told them how he was injured in the work of the defendant. Speaking through Justice Donegan, on pages 1326, 1328, of 223 Iowa, pages 40, 41, of 275 N. W., this court said:

"It is contended by the appellant [the claimant] that this evidence was admissible and competent, because it was introduced as a part of the necessary history of the case, which the doctors required in making their diagnosis and determining the treatment to be administered. * * * It is appellant's contention that the testimony given by the doctors Keeffe and Hanson, in which they detailed statements made to them by Schuler as to how he received the scratch * * * is not inadmissible as hearsay evidence. In support of this contention appellant cites State v. Blydenburg, 135 Iowa 264, 274 * * * It will be noted that in that case [Blydenburg], and in other cases, where a doctor is allowed to give statements made to him by the patient in obtaining the history of the case, the evidence is admitted, as the quotation above indicates, for the purpose of allowing the doctor to give the reasons upon which his opinion is based, and not for the purpose of proving the truth of the facts detailed by the patient to the doctor."

Other citations are unnecessary, but see annotation in 67 A. L. R. 10, and particularly division No. VIII, page 25 et seq.

III. Counsel for appellees argue, and the trial court found, that, regardless of whether the inception of the disability was a bruise or a boil, the infection was thereafter aggravated and accelerated by the work. This theory is based upon the statement of Doctor Stroy that the operation of an automatic drill would have a tendency to "massage" or "scatter" the infection through the system. We do not know whether the commissioner questioned the pathological phenomenon of shaking staphylococci from the left hand to the right foot, rather than passing through the blood stream. He was not bound, of course, to accept any expert opinion. But the record shows,

and the commissioner may well have had in mind, when he made his decision, that the last time the deceased could possibly have used the pavement breaker was not later than September 28th or 29th, and during the month following he was flagging traffic, or doing no real physical labor. The infection in his foot did not appear until on or about November 1st. But regardless of the basis of the finding, the trial court had no authority to usurp the fact-finding right of the commissioner. Flint v. Eldon, 191 Iowa 845, 183 N. W. 344. The trial before him was not de novo. Jarman v. Collins-Hill Co., 226 Iowa 1247, 286 N. W. 526; Brown v. Rath Packing Co., 219 Iowa 9, 257 N. W. 411; Dille v. Plainview Coal Co., 217 Iowa 827, 250 N. W. 607. Under the record, the manner of how the bruise was received, if it was received, whether by striking on the implement, or in some other way, or by the vibration, is wholly surmise and conjecture. Even the hearsay declarations of the deceased throw no light on the question. There is direct evidence of the foreman of the crew whose regular work it was to operate the implement that he never knew of a person to injure his hands in using it.

IV. The record discloses beyond question that there is a decided conflict in the evidence on the fact issue of whether the disability of the deceased arose out of the work he was performing in the employment of the Commission. To say there is no dispute is to disregard the evidence. There is, and there could be no direct testimony disputing the testimony of Doctor Stroy that the deceased told him that he had bruised his hand on the drill. However, this did not make the testimony conclusive or binding upon the commissioner. As stated in Serrano v. Cudahy Packing Company, 194 Iowa 689, 691, 190 N. W. 132, 133:

"Evidence offered before the industrial commissioner is subject to the usual tests of credibility and this is true although no witness contradicts. The finding of the commissioner has the same force and effect as the finding of a jury. A jury is not bound to accept as true the testimony of a witness not contradicted by other witnesses. A jury takes into consideration the means and the opportunity of a witness to know the facts to which his testimony relates. This is also the privilege of the

commissioner and it is for him to determine the consistency of the testimony and in the light of all proven facts and circumstances to weigh the credibility thereof.''

Under facts having a general similarity to those in this case, the court, in Miller v. Gardner & Lindberg, 190 Iowa 700, 704, 180 N. W. 742, 743, said:

''It will not do to say that the evidence of the claimant is binding upon the commissioner, in the absence of direct contradiction. It will not do to say that the commissioner may not consider the weight and credibility of his evidence, in the light of all the circumstances.''

In that case also the initial lesion was slight, and no mention was made of it, and no one saw how it happened, and the employee made inconsistent statements about it. The court said that it would not do to say all this ''was without probative effect as tending to negative the plaintiff's claim. It was evidence competent as a matter of law, and it did tend to reduce the weight and credibility of the claimant's testimony.'' To the same effect, see Schuler v. Cudahy Packing Co., supra (223 Iowa 1323, 275 N. W. 39). In Enfield v. The Certain-teed Products Co., 211 Iowa 1004, 1008, 233 N. W. 141, 143, we said:

''While acting within the limits of his jurisdiction, the industrial commissioner cannot be interfered with by the district court or this tribunal. * * * Interference by the courts with the state industrial commissioner under those circumstances amounts to the usurpation of power. * * * Obviously, the absence of a conflict in the evidence is not enough to give the courts jurisdiction in the premises. * * * Consequently, claimant has not met the requirements to set aside the commissioner's finding by merely alleging that there is no conflict in the evidence.''

In Heinen v. Motor Inn Corp., 202 Iowa 67, 69, 209 N. W. 415, 416, we said:

''There is no great conflict in the direct evidence, but the commissioner had the right to draw any legitimate inference therefrom.''

. . .

A case rather close in its facts and holding to this one is Antonew v. N. W. States Portland Cement Co., 204 Iowa 1001, 216 N. W. 695.

V. Appellees repeatedly urge in their argument that, conceding the commissioner had the right to determine the weight and credibility of the evidence and its preponderance, he did not do so and did not make any finding on any fact issue, and his decision was based solely upon an erroneous legal conclusion respecting the admissibility of the declarations of the deceased, and that therefore the district court had a right to reverse the commissioner and to enter judgment based upon its determination of the value and preponderance of the evidence. This contention is without merit for two reasons:

First, the commissioner did not hold that the declarations made to Doctor Stroy were not admissible. He specifically held that for the purpose of diagnosis and treatment they were admissible but that they could not "be considered to prove the substantive fact vital to the case." This in itself is a finding of fact on the vital issue. Also his legal conclusion respecting the weight and purpose of the testimony was correct. The same is true of the testimony of the three children that their father told Karns he had injured his hand while using the pavement breaker. The commissioner did not hold this testimony was inadmissible. He held just the contrary. Of it, he said:

"* * * assuming the evidence of the children is true with what the injured man stated to his foreman, some considerable time after the time of the alleged injury, it would amount to no more than a self-serving statement, *competent for the purpose of showing notice of injury but not in support of the injury.* The fact if it be a fact that notice of the alleged injury was given is not sufficient or competent to prove that the alleged injury was one arising out of and in the course of the employment."

The commissioner was right in his conclusion of law respecting the admissibility and purpose of this testimony. The defendant had denied notice and knowledge of any injury arising out of the work. The testimony of the children that they heard their father make the statement to his foreman was admissible on the issue of notice. It was not hearsay on the fact of notice, but

it was direct and substantive evidence thereof. It was, however, hearsay as to the facts stated in the declaration, and the commissioner was right in holding that it could not be considered for that purpose. The fact that no objections of hearsay were made to testimony of the declarations to both Doctor Stroy and to Karns is of no significance, for they would have been rightly overruled. These hearings were not before a jury, but were before the deputy and the commissioner—men experienced in hearings of this kind and in the rules of evidence—and it was not necessary to ask for a limitation on the purpose of the testimony.

Second, with respect to the claim that the commissioner made no findings of fact. It is without merit. In his opinion and decision are found statements that:

"* * * in view of our holding that there is not sufficient competent evidence to support the claim that the alleged injury causing death arose out of and in the course of the employment," and "from a very careful examination of the record, that when we exclude hearsay and self-serving statements, we are of the opinion defendant's contention [that there is no competent evidence] must be sustained."

The commissioner's final conclusion is that:

"Based upon the record evidence and the law applicable thereto, it must be and it is held that the award as made should be and it is hereby reversed and claimant's petition dismissed."

The arbitrator's award was based upon specific findings of facts, and the decision setting aside the award necessarily is a finding of facts contrary to those of the arbitrator. This contention of appellees is without basis and is over-technical in a proceeding and procedure intended to be simple and informal. As we said in Comingore v. Shenandoah Art. Ice, etc., Co., 208 Iowa 430, 435, 226 N. W. 124, 127:

"The Compensation Act contemplates that relief shall be had, not through the courts, or with the aid of lawyers, but through the machinery provided by the act itself. It has been said that the purpose of the legislature in the enactment of the act was 'to create a tribunal to do rough justice, speedy, summary, informal, untechnical;' and if a court in the slightest

degree intrenches upon the prerogatives of the commissioner, one encroachment will breed another, until finally simplicity will give way to complexity, and informality to technicality."

VI. Appellees also urge that the findings and adjudications of fact by the trial court stand with the same effect as the verdict of a jury. What we have already said disposes of any merit this proposition may have as applied to this case.

We have carefully considered all contentions of the appellees in support of the judgment appealed from, and it is our conclusion and judgment that it should be reversed and the opinion and decision in review of the industrial commissioner be restored in full force and effect.—Reversed.

SAGER, HAMILTON, STIGER, HALE, and MILLER, JJ., concur.

RICHARDS, C. J., and OLIVER, J., dissent.

RICHARDS, C. J. (dissenting)—The majority opinion is bottomed on cases holding that evidence of a decedent-employee's statements that he was injured in course of his work is incompetent in workmen's compensation cases, under the hearsay rule. In these cases it is said that the rule is not merely technical, but is founded upon the experience, common knowledge and conduct of mankind. That same experience, common knowledge and conduct of mankind, however, is likewise the foundation for another concept, that is, the clear necessity in the interests of justice that the rule be relaxed, in at least some situations, where there is no possibility of producing evidence other than hearsay. As in this case, in the course of his work, an employee may receive an injury of such minor character that it does not arrest the attention of any other person, or it may be no other persons are present. Infection results and the employee dies therefrom. The compensation the law provides cannot be allowed his dependents, as our cases now stand.

In some jurisdictions the workmen's compensation statutes are held to abrogate the hearsay evidence rule. Carroll v. Knickerbocker Ice Co., 218 N. Y. 435, 113 N. E. 507, Ann. Cas. 1918B, 540. Our own legislature has enacted that neither the board of arbitration nor the commissioner shall be bound by

724

any common law or statutory rules of evidence. Section 1441, Code, 1935. But in the cases the majority follows, neither the concept of necessity nor the intendment of the statute seems to have been accorded the deserved careful consideration. This was likely not appreciated at the time, at least not by the writer of this dissent. And it may well be that the necessity, in the interests of justice, for relaxing the rule in just such a case as has been depicted was foreseen and intended by the legislature. The previsioning of such possibilities would inhere in the devising of an act that would effect the fundamental purpose the legislature had in mind. That purpose was that every employee, entitled thereto, should have the benefit of a fixed compensation, in deprivation of all his previous rights and claims against the employer. This statutory abrogation of rules of evidence seemingly contemplated that, if the commissioner found believableness in hearsay testimony, he could consider it, not as a jury of laymen might do, but as would be done by the skilled and experienced trier of facts the legislature intended and presumed he would be. If that be true we have held erroneously that he may not listen to, or if he listens must discard anything of truth found in, hearsay testimony. In my opinion the question deserves careful reconsideration, and because that is not found in the majority opinion I cannot agree therewith.

OLIVER, J., joins in the foregoing dissent.