ARTHUR H. JOHNSON et al., Appellants, v. IOWA EMPLOYMENT SECURITY COMMISSION et al., Appellees.

No. 47201.

(Reported in 32 N. W. 2d 786)

JUNE 15, 1948.

Hoegh & Meyer, of Chariton, for appellants.

F. D. Riley, of Des Moines, for Iowa Employment Security Commission, appellee.

BLISS, J.—The plaintiffs—seventy-nine in number—were employed in the coal mine in Lucas County, Iowa, of Arch Jones, doing business as the Jones Coal Company. They were, at all times pertinent, members of Local Union No. 1933 of the U.M. W.A. The period for which they claim unemployment benefits was from April 1, 1946, to May 29, 1946. It fairly appears that the employment contract between the employer and the employees, negotiated and executed on behalf of the latter by the U.M.W.A. or its representatives, terminated on April 1, 1946. On April 3, 1946, the employer notified the Iowa Employment Security Commission of the stoppage of work on I.E.S.C. Form 215 (Notice of Stoppage of Work by Reason of a Labor Dispute). The following statement accompanied the notice:

"Our mine has not operated since April 1, 1946. This is not due to a seasonal layoff. Notices were posted at the mine on April 2, 1946, that this mine would resume operations based on the contract they had formerly been working under. I also notified the local union president, Mr. Johnson, Local Union No. 1933, that this mine would resume operations on April 2, 1946.

"I have contracts for coal that would have kept my mine in operation. The union can return any time they desire based on the contract they had been working under prior to April 1, 1946. Production has completely ceased."

On or about May 27, 1946, the Commission, on its findings, made the following decision:

"Claimants are disqualified for benefits because their unemployment was due to a stoppage of work caused by a labor dispute over the terms of and the failure to negotiate a new contract at the mine of the Jones Coal Company, Chariton, Iowa, which stoppage of work commenced April 2, 1946."

On June 13, 1946, Arthur H. Johnson filed an appeal to the Commission and on July 16, 1946, hearing thereon was had before Earl W. Fritz, appeal referee. At this hearing officers of Local No. 1933, and also the superintendent of the Jones Coal Company were witnesses. The Initial Determination was adverse to claimants. There was a like result before the Appeal Tribunal. On August 27, 1946, a hearing was had before the

Commission. On the testimony introduced and the entire record submitted on the appeal, the Commission found:

"Prior to March 31, 1946, the claimants had been employed by the employer-respondent in accordance with the terms and conditions of the contract between the employer and the United Mine Workers of America. The contract was invalidated by union notice that the said contract would expire on March 31, 1946. It is clear from the record that the claimants, members of the union, would not work without a contract after March 31, 1946, unless the employer agreed to the terms of the United Mine Workers of America's proposed agreement. This the employer refused to do and claimants did not report for work April 2, 1946, because of this labor dispute. The stoppage of work April 2, 1946, was due to this labor dispute."

The findings refer to its Form 215, above noted, which the employer gave to the Commission. These findings also set out a letter the employer wrote to the Commission on May 23, 1946, stating:

"I wish to cancel my protest on Form 215 in regard to the miners being out on account of a labor dispute. Upon investigation I find it would have been impossible for me to operate after April 1, 1946, on account of the lack of a profitable market. I wish to make this retroactive to April 1, 1946."

Of this letter the Commission in its findings states:

"It is difficult to understand the employer's position with respect to his letter of May 23, 1946, for the reason that on June 19, 1946, he signed the following statement: 'June 19, 1946. A stoppage of work occurred at the mine on April 2 when 83 employees quit work and took their tools home. There has been a sign posted in the washhouse at the mine ever since to the effect that the mine was ready to operate any time the employees would return. * * * The miners never reported back to go to work.'

"On July 9, 1946, the employer submitted a typewritten statement to the Commission giving the reasons 'why I cannot comply with the union wage scale.' It reads in part: 'These men

went out on strike April 1, 1946, to enforce their demands for a new contract * * * I expected to work April, May, June. I expected to lose from $600 to $1,000 a month for the three months but by so working I would have furthered the entries and have the mine in shape that I could have produced coal when there was a sale for coal. However, the men quit. * * * The new contract allows the miners a raise of $1.85 a day. I have 55 diggers that are paid by the ton. I have men that will produce 5 tons and men that will produce 12 tons a day. The first I would pay 37 cents a ton raise and the second man would be getting about 13 cents a ton raise. How do you suppose that would work? * * * I am not going to pay the vacation pay as it is set up because I haven't the money and because it is unreasonable along with the other items.' "

The superintendent of the company had testified—the Commission states he was "apparently speaking for the employer at the hearing—[and] recommended that the claim be paid because: 'I suppose it was a little sympathy. I felt when I recommended it to Mr. Jones that these men were not responsible for being out inasmuch as the contracts were made in the East. These boys didn't have any alternative except to come out. * * * That is the only reason that they were out, because of orders from the International, but I don't know of any way they could get out of being out so I figured they weren't to blame altogether. In other words, they didn't have any other choice as I could see it.' " 

The "Findings of Fact and Conclusions of Law" of the Commission continues:

"The above statements of Mr. Jones, the employer, and Mr. Gray, the mine superintendent, do not deny the existence of a labor dispute as of April 2, 1946, when the stoppage of work was effected and confirm the employer's statement on Form 215 that the stoppage of work April 2, 1946, was due to a labor dispute. * * * The contention of the claimants that the operator would not have operated the mine between April 3, 1946, and May 29, 1946, because of lack of a profitable market is not convincing considering the signs that were posted at the mine denoting that work would be resumed and the employer's state-

ments filed with the Commission on April 3; June 19, and July 9, 1946. These statements give further proof of the fact that work was available for the claimants had they returned to the mine. The further contention that the stoppage was caused by a seasonal condition and would have occurred regardless of the union contract is not established by the record. We conclude that the stoppage of work was caused by a labor dispute.

"Decision: The decision of the Appeal Tribunal dated July 19, 1946, should be affirmed. The claimants are disqualified for benefits because their unemployment was due to a stoppage of work caused by a labor dispute over the terms and failure to negotiate a new contract * * * which stoppage of work commenced on April 2, 1946, and ended on May 29, 1946."

The decision was signed by each member of the Commission, and was mailed September 20, 1946.

On application of the claimants, joined in by the employer, the Commission reopened the hearing and claimants offered additional testimony before the Commission on November 27, 1946. Much of this testimony bore upon the contention of claimants that the work stoppage was due to the fact that there was no market for the coal; that when work stopped at the close of the day on March 30, 1946, there were 220 tons of coal in the bins and more than 40 tons in cars at the foot of the shaft, and the lump-coal bin was so full that the shaker would not work. The bins were being emptied by daily sales. There were 55 tons remaining in the bins in the latter week of May. This testimony is far from conclusive that mining could not have continued. No witness offered any definite testimony to the contrary. The statement of the employer was that he intended to keep the mine open during May, June and July. He stated that he posted the work notice in the miners' washhouse on April 2, 1946. Plaintiffs' witnesses say they never saw it at that time, but they admit they saw it later. The employer stated that he notified Johnson, the president of Local No. 1933, that the mine was open for work. Johnson denied this. But the denial simply makes a conflict. Naturally, when it became generally known in the surrounding territory that the miners were not working and production of coal was ended, trucks discontinued

coming to the mine for coal. But the fact that there may have been a slow coal market is not the controlling question in this matter. The determining issue is whether the men quit work because there was no contract, or because the parties could not agree upon the terms of a new contract, or whether they would have worked if work was available. The decisive point is, Was the stopping of work due to a labor dispute?

Let us examine the evidence a little further on these questions. Mr. Gray, the mine superintendent, testified:

"That notice was posted on the 2nd of April, because I posted it myself. It was posted in the washhouse where all notices are posted."

Mr. Johnson, president of the local union was asked:

"Q. Why did you and your men fail to report to work on April 2, 1946? A. *Well, as I say, we never had no contract. We did not know what we were going to get.* Q. And the stoppage of work which occurred on April 2, 1946, at the Jones Coal Company was occasioned by failure to negotiate an acceptable new contract? A. They claimed they couldn't accept because they couldn't sell coal at $4.47 a ton."

The witness after stating the number of days the miners worked in March 1946 testified: *"Then they found out that there was no contract signed."*

Gray testified:

"I am superintendent of the Jones Coal Company and was during the period of the dispute. Stoppage of work occurred on April 2nd. Cause of the stoppage of work, as I understand it, there was no definite time set for termination of agreement, and John L. Lewis gave the necessary time notice that the agreement would expire on March 31. These men came out pursuant to John L. Lewis' orders to negotiate a new contract—a new wage contract. * * * I do feel that the stoppage of work was caused by the National Union Headquarters."

James P. Agnessen, for claimants, testified: "I am president of District No. 13, U.M.W.A. Mr. Jones could have participated in a new contract. Showed no desire to negotiate a new contract."

A witness for claimants testified Lewis did not give orders to stop work. There is evidence that Lewis was active in the matter. Johnson, former president of the local union, at the hearing on November 27, 1946, testified: "I received a telegram on May 10, 1946, from John L. Lewis in which he stated that we should call the coal management and tell them we were willing to work from May 12 to May 25, 1946."

Evan Ellis, a witness for claimants at the November 1946 hearing testified:

"I am president of the Local No. 1933 of the United Mine Workers of America * * * I couldn't say they wouldn't have had any work in April or May * * *.

"Stiger [chairman of Commission]: Isn't it true that the men wouldn't have worked under the terms of the old contract that expired?

"Ellis: *They* gave them that right to work retroactive. No, they would have worked under the old one retroactive because they didn't know what the new one would be.

· "Stiger: Jones didn't agree to that?

"Ellis: I couldn't say there was any dispute. The only negotiation there was was when our President *received notice* that Jones should operate retroactive and he flatly turned it down. * * *

"Pefferle [commissioner]: Mr. Ellis, Mr. Jones has said that on April 1st he had orders for coal that would have kept the mine in operation. Do you to your personal knowledge know that that was not so? Are you disputing the accuracy of that statement?

"Ellis: Not to my knowledge.

"Pefferle: You do not say that he did not have them?

"Ellis: (No Answer)."

After the reopened hearing of November 27, 1946, and the consideration of the additional evidence and the briefs and arguments submitted by the parties, the Commission again filed Findings of Facts and Conclusions at Law, including and taking into consideration those filed on September 20, 1946. It passed upon the claims of each of the three groups of claimants—the

first group, those actually engaged in mining coal. It found that the unemployment of these was clearly due to a labor dispute, in that they quit work when the old contract was terminated on March 31, 1946, and were unemployed while the controversy over the wage terms and work conditions of the new contract continued. During the so-called "truce period" from May 13th to May 25th, proposed by the union, these claimants remained unemployed since there was no agreement as to the terms of the "truce".

The second group were the maintenance or "company men", who by agreement of the company and the union continued to perform the maintenance work necessary to the protection of the mine. The unemployment of any of this group who were not at work was due to the labor dispute since they would have been employed had the productive operation of the mine not been stopped.

There were some among the claimants who were designated as being "on the list" (a miner's working term) which it is unnecessary that we attempt to explain. The Commission found that the unemployment of this group was due to the stoppage of work caused by the dispute.

In its decision the Commission, unanimously held that the decision of the Appeal Tribunal of July 19, 1946, was affirmed, and that all claimants were disqualified for benefits because their unemployment commencing on April 2, 1946, and ending on May 29, 1946, was due to a stoppage of work caused by a labor dispute over the terms of, and the failure to negotiate, a new contract with the employer. The findings and decision were made and mailed to plaintiffs on January 27, 1947.

The district court in its ruling entered of record May 26, 1947, quoted section 96.6, subsection 10(4), Code of 1946, to wit:

"*Decision on appeal.* Any order or decision of the commission may be modified, reversed, or set aside on one or more of the following grounds and on no other: * * *

"4. If there is not sufficient competent evidence in the record to warrant the making of the order or decision."

The court then said:

"It is claimed that the plaintiffs are entitled to relief under

the 4th provision above quoted. I have read carefully all the pleadings, records and evidence submitted, and reach the conclusion that there is evidence from which the Commission might make each of its findings."

In its judgment and decree entered of record on July 3, 1947, the court affirmed the decision of the Commission and dismissed the petition of plaintiffs.

■ I. It is our conclusion that the record fully sustains the rulings and judgment and decree of the district court.

Section 96.5(4a and b), Code of 1946, provides:

"Causes. An individual shall be disqualified for benefits: * * *

"4. *Labor disputes.* For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute * * * provided that this subsection shall not apply if it is shown to the satisfaction of the commission that:

"*a.* He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"*b.* He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute."

The Commission found that all claimants were disqualified under subsection 4 and were not exempted from disqualification by paragraphs *(a)* and *(b)*. Plaintiffs do not challenge the finding under paragraphs *(a)* and *(b)*.

The entire record convincingly establishes that plaintiffs quit work when the old contract was terminated, and refused to work throughout the period from April 2 to May 29, 1946, inclusive, because of the controversy over the terms of, and the failure to negotiate, a new contract, and that in both matters they were acting under the orders or advice of their superior officers in the United Mine Workers of America. It is significant that Ellis testified that *"They* gave them that right to work

retroactive" and "our President *received notice* that Jones should operate retroactive." "They" who gave "the notice" could hardly have been other than those superiors.

It is also quite inconsistent with plaintiffs' claim that the unemployment was merely seasonal and because of a lack of market for coal, that John L. Lewis urged that they work during a so-called "truce", and that they work "retroactive"—that is that they go to work on condition that the terms of any new contract be retroactive to April 1, 1946.

Section 96.5(4), supra, and our decision in Dallas Fuel Co. v. Horne, 230 Iowa 1148, 300 N. W. 303, fully sustain the decision of the Commission, and of the district court.

A "labor dispute" existed between the union and the plaintiffs on one side and the Jones Coal Company on the other because the plaintiffs would not work without a contract. See Dallas Fuel Co. v. Horne, supra.

In Miners in General Group v. Hix, 123 W. Va. 637, 17 S.E. 2d 810, it was held that a "labor dispute" prohibiting payment of unemployment compensation may exist in the absence of a contract, and that where an existing contract was about to expire, and differences of opinion arose concerning a new contract or continuance or modification of the old contract, and unemployment resulted from the disagreement, there was a labor dispute preventing allowance of unemployment compensation to miners. The court stated that the purpose of unemployment-compensation legislation is to provide employment for unfortunate victims of maladjusted economy who are unable to obtain suitable work at living wage, and not to enable those who are offered continuation of existing employment to refrain from work until they have secured additional advantages.

Further quotation of authority is unnecessary since plaintiffs challenge only the sufficiency of the evidence, but in support of the principles mentioned in the West Virginia case, supra, we call attention to: Department of Industrial Relations v. Pesnell, 29 Ala. App. 528, 199 So. 720, certiorari denied by Supreme Court of Alabama, Ex parte Pesnell, 240 Ala. 457, 199 So. 726, and by Supreme Court of the United States, 313 U. S. 590, 61 S. Ct. 1113, 85 L. Ed. 1545; Sandoval v. Industrial

Commission, 110 Colo. 108, 130 P. 2d 930; Walter Bledsoe Coal Co. v. Review Board, 221 Ind. 16, 46 N. E. 2d 477; Unemployment Compensation Commission of Alaska v. Aragon, 329 U. S. 143, 67 S. Ct. 245, 91 L. Ed. 136, 143, 144; Barnes v. Hall, 285 Ky. 160, 146 S. W. 2d 929, 935, 936; Block Coal & Coke Co. v. United Mine Workers of America, 177 Tenn. 247, 148 S. W. 2d 364, 366–368, dissenting opinion in 149 S. W. 2d 469. In Sandoval v. Industrial Comm., supra, in which a judgment adverse to claimants was affirmed (Hilliard, J., dissenting) it was held that a labor dispute is broader than a strike and conceivably may exist without a strike.

█ II. Respecting plaintiffs' contention that the work stoppage was due to lack of work, the Supreme Court of Utah in Employees of Utah Fuel Co. v. Industrial Comm., 99 Utah 88, 95, 104 P. 2d 197, 200, said:

"Petitioners assert that the Utah Fuel Company started to repair its tipple and do other construction work during this period in question and that the portion of the mine wherein work was being prosecuted was practically worked out; that therefore the company was not in a position to mine coal and did not have work for petitioners. From this they reason that stoppage was not due to a strike. Whatever the facts be, we think them immaterial. After the company was notified and the men left work, it matters not what the company did at its mine until the dispute was settled and the strike over. There is no evidence that the company caused the stoppage of work * * *. The strike caused the stoppage.

"There was a conflict on whether or not the company had orders for coal and therefore would have mined coal, had the strike not been called. This, too, is immaterial. If workers walk out on a strike and refuse to return, except on a certain contingency, their unemployment is due to a strike regardless of any speculation or proof as to whether they would have been totally or partially unemployed had they not struck. Petitioners talk much about the burden of proof as though an application for benefits were a suit between two adverse parties. But this and other cases under the Unemployment Compensation Act are not suits of plaintiff versus defendant. They are simply applica-

tions for benefits from a fund which the Industrial Commission is administering. It is incorrect to say that the burden of proof is on an employer in circumstances such as are here presented to show that he had work available, and that if he fails to sustain that burden benefits must be paid to striking employees."

■ III. The findings of fact by the Commission are binding on appeal upon the district court and upon this court, where supported by substantial competent evidence. Wolfe v. Iowa Unemployment Comp. Comm., 232 Iowa 1254, 1257, 7 N. W. 2d 799. See, also, Woods Bros. Constr. Co. v. Iowa Unemployment Comp. Comm., 229 Iowa 1171, 296 N. W. 345; Moorman Mfg. Co. v. Iowa Unemployment Comp. Comm., 230 Iowa 123, 129, 296 N. W. 791; Meredith Pub. Co. v. Iowa Employment Sec. Comm., 232 Iowa 666, 6 N. W. 2d 6; Dallas Fuel Co. v. Horne, supra, 230 Iowa 1148, 300 N. W. 303.

■ IV. Section 96.6(6), Iowa Code of 1946 provides:

"*Procedure.* The manner in which disputed claims shall be presented, the reports thereon required from the claimant and from employers, and the conduct of hearings and appeals shall be in accordance with rules prescribed by the commission for determining the rights of the parties, *whether or not such rules conform to common law or statutory rules of evidence and other technical rules of procedure.*" (Italics supplied.)

This provision is similar to section 86.18, Code of Iowa, 1946, in the Workmen's Compensation Statute. This section was construed by this court in DeLong v. Iowa State Highway Comm., 229 Iowa 700, 711, 712, 295 N. W. 91, 97. Speaking of the admission of hearsay testimony, we there said:

"We have given full effect to the legislative intention expressed in Code section 1441 [section 86.18, Code, 1946], but the effect and trend of our decisions in compensation cases has been that 'in the end there must be a residuum of legal evidence to support the claim before an award can be made.'"

In the case before us, hearsay testimony was introduced by each party, and as noted herein such testimony offered against the plaintiffs was amply supported and corroborated by other

competent substantive evidence of recognized probative character, and by surrounding circumstances and proper inferences.

The judgment and decree of the district court is affirmed.— Affirmed.

All JUSTICES concur.